

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-14-2000

# Crivelli v. General Motors Corp

Precedential or Non-Precedential:

Docket 99-3133

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Crivelli v. General Motors Corp" (2000). *2000 Decisions.* Paper 130.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/130

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 14, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-3133

NICHOLAS CRIVELLI;
NICHOLAS CRIVELLI CHEVROLET, INC.;
NICHOLAS CRIVELLI AND ORLAND CRIVELLI,
t/d/b/a Crivelli Enterprises

v.

GENERAL MOTORS CORPORATION,
        Appellant

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 94-cv-01453)
District Judge: Honorable Donald E. Ziegler

Argued December 6, 1999

BEFORE: SLOVITER, ROTH and COWEN, Circuit Judges

(Filed June 14, 2000)

        Evan M. Tager
        Eileen Penner (Argued)
        Thomas B. Colby
        Mayer, Brown & Platt
        Washington, DC 20006

        James A. Mollica, Jr.
        Mollica & Murray
        Pittsburgh, PA 15211

        Carol Lesnek-Cooper
        Detroit, MI 48232

         Attorneys for Appellant

Diane W. Perer (Argued)
Swensen Perer & Kontos
Pittsburgh, PA 15222

J. Alan Johnson
Pittsburgh, PA 15219

Samuel J. Orr, III
Beaver, PA 15009

Attorneys for Appellees

OPINION OF THE COURT

SLOVITER, Circuit Judge.

I.

INTRODUCTION

The issue presented in this case is whether the exercise by General Motors Corp. ("GM") of its contractual right of first refusal violated S 818.9(b)(3) of the Pennsylvania Board of Vehicles Act ("the Act"), which prohibits an automobile manufacturer from unreasonably withholding its consent to the sale of a new vehicle dealer's franchise to a qualified buyer. Nicholas Crivelli and Nicholas Crivelli Chevrolet, Inc. (collectively Crivelli), the prospective buyer of the Oldsmobile-Cadillac dealership at issue, brought this action contending that GM violated the Act and intentionally interfered with Crivelli's contract to purchase the dealership when GM exercised its right of first refusal for the dealership, allegedly without any reasonable justification. The issue is a question of first impression for this court.

II.

BACKGROUND

Paul Scheidmantel was the owner and operator of an Oldsmobile-Cadillac automobile dealership in Beaver Falls,

2

Pennsylvania since 1987 pursuant to an agreement with GM. That agreement required Scheidmantel to provide GM with prior written notice of any proposed change or transfer of the dealership, required GM's approval for such change, and required GM to promptly consider the proposal, which it could not "arbitrarily refuse to approve." See Dealer Sales & Service Agreement, Art. 12.2. In addition to the provision requiring GM's consent to any transfer of the dealership, the agreement provided GM with a right of first refusal. The only limitation was that GM could not exercise this right if the proposed transfer was to a member of the dealer's family or to a qualified member of the dealer's management. See Dealer Sales & Service Agreement, Art. 12.3.5.

Scheidmantel ran into serious financial trouble and decided in 1991 to sell the dealership. On October 2, 1991, he entered into an agreement under which Floyd McElwain would purchase Scheidmantel's GM dealership along with the assets, subject to GM's approval. The McElwain family owned and operated McElwain Chevrolet–Oldsmobile, Inc., in nearby Ellwood City, and the agreement with Scheidmantel contemplated that the Scheidmantel dealership would stay in Beaver Falls. Scheidmantel informed the local GM zone office, in this case the Oldsmobile Zone Office, of the proposed sale. The local GM zone office has the responsibility of making the initial recommendation with respect to any proposed change in dealership. The local zone office forwards its recommendation to GM's Retail Organization and Development Department in Lansing, Michigan, where the proposal and recommendation are considered and afinal recommendation made to corporate headquarters. In this case, Charles Fisher, the manager of the local zone office, recommended to GM headquarters that it approve the McElwain–Scheidmantel proposal.

Prior to receiving word from GM headquarters, McElwain became concerned over whether Scheidmantel could satisfy his creditors, and he rescinded the agreement but offered to reinstate it if sufficient guarantees were created. Scheidmantel, however, turned to Crivelli, who had previously expressed interest in buying the dealership. Crivelli and Scheidmantel entered into a buy–sell agreement

3

on November 20, 1991. The agreement was conditioned on obtaining the approval of GM and relocation of the dealership from Beaver Falls to the more modern facilities in nearby Vanport, Pennsylvania that housed Nick Crivelli Chevrolet, Inc.

After reviewing the Scheidmantel-Crivelli buy-sell agreement, the local zone office manager was concerned about the new proposed sale because of Crivelli's plan to move the dealership from Beaver Falls, and advised Scheidmantel on December 7, 1991 that he would oppose the transfer for that reason. The local zone office, interested in maintaining the dealership in Beaver Falls, encouraged McElwain to reconsider purchasing it and promised that GM would exercise its right of first refusal if McElwain agreed to buy and run the Beaver Falls dealership. Meanwhile, Crivelli, who had been advised of GM's desire that the dealership stay in Beaver Falls, agreed not to move it out of Beaver Falls. Crivelli mailed notification of its concession to GM and to the local zone office on January 30, 1992 and January 31, 1992 respectively. By then, the local zone office had already recommended GM exercise its right of first refusal and GM formally advised Scheidmantel and Crivelli of its intention to do so on February 6, 1992.

In an internal memorandum dated February 4, 1992, David Hartner, the manager of GM's Retail Organization and Development Department, explained to his supervisors his reasons for exercising the right of first refusal as follows:

> It should be noted that the decision to exercise our Right of First Refusal was based on the fact that the proposed buyer, Nick Crivelli Chevrolet had planned to relocate the Oldsmobile and Cadillac Dealership Operation to a different community. That proposal was totally unacceptable to Oldsmobile and Cadillac. They have since modified their agreement wherein the buyer would now plan to stay in Beaver Falls. However, we feel that Floyd McElwain is a superior candidate for us at this location and we plan to proceed with the Right of First Refusal.

JA at 1789.

4

Before any sale was consummated, Scheidmantel's creditors filed an involuntary bankruptcy petition on March 20, 1992, and the disposition of the dealership transferred to the jurisdiction of the Bankruptcy Court. The Bankruptcy Court entertained a number of bids for the dealership, including a bid from Crivelli and McElwain. The Bankruptcy Court approved the sale of the dealership to McElwain, due in part to GM's approval of that arrangement. Crivelli never appealed the Bankruptcy Court's order that approved the sale of the dealership to McElwain. McElwain opened McElwain's Oldsmobile/Cadillac dealership at the Scheidmantel location in Beaver Falls in May, 1992.

Crivelli filed suit against GM in the United States District Court for violation of the Pennsylvania Board of Vehicles Act and for tortious interference with a contract, alleging GM unreasonably withheld its consent to the sale of the dealership when it exercised its right of first refusal. During the pretrial proceedings, GM filed a motion for summary judgment contending, inter alia, that the Act did not preclude its exercise of its right of first refusal. The District Court denied the motion. After a lengthy trial, a jury determined that GM violated S 818.9 of the Act and similarly concluded that GM intentionally and improperly interfered with the buy-sell agreement between Crivelli and Scheidmantel. The jury awarded compensatory damages of $3.5 million in expected lost profits. The District Court denied GM's post trial motion and entered judgment for Crivelli on the verdict.

GM appeals on four grounds. Its principal claim is that a manufacturer's exercise of its right of first refusal does not constitute an unreasonable withholding of consent under S 818.9 of the Act nor does it constitute tortious interference with a contact. In the alternative, GM contends that whether a manufacturer's conduct is "unreasonable" under the Act should be measured by a good-faith business judgment standard and that the District Court erred in refusing to grant GM's jury instruction to that effect; that the District Court exceeded its discretion by cutting off testimony of GM's most important witness; and that GM is entitled to a new trial on damages as the award of $3.5 million is manifestly excessive.

5

We have jurisdiction of the appeal under 28 U.S.C.
S 1291. To the extent that the appeal raises legal issues,
our review is plenary.

III.

DISCUSSION

A.

The Pennsylvania Board of Vehicles Act

Crivelli relies principally on S 818.9 of the Pennsylvania
Board of Vehicles Act enacted in 1983 and amended in
1991 and 1996. Pa. Stat. Ann. tit. 63, S 818.9(b)(3) (1991)
(amended 1996). The 1991 version is controlling here.
Section 818.9 provides that a manufacturer cannot
unreasonably withhold its consent to the sale, transfer, or
exchange of a new vehicle dealer franchise. Crivelli argues
that S 818.9 governed GM's exercise of its right of first
refusal and that by exercising that right, GM violated the
Act by unreasonably withholding its consent to
Scheidmantel's transfer of the dealership to Crivelli. In
reply, GM argues that the absence of any reference to the
right of first refusal in the Act as it existed at the relevant
time, as well as the long-established practice of including
such rights in dealership agreements, shows that the
Pennsylvania legislature did not intend S 818.9 to restrict
the manufacturer's ability to exercise its contractual right
of first refusal. There is no reported decision from a
Pennsylvania court on the application of S 818.9 to a right
of first refusal nor have we or the parties found any helpful
legislative history as to the Act either before or after its
amendment in 1996, which added S 818.16 (titled
"Manufacturer right of first refusal").

A right of first refusal grants the holder (in this case the
manufacturer) the option to purchase the grantor's (here
the dealer) property on the terms and conditions of sale
contained in a bona fide offer by a third party to purchase
such property. See Black's Law Dictionary 1325 (6th ed.

6

1990). It has been recognized and given effect by this court, see Schultze v. Chevron Oil Co., 579 F.2d 776 (3d Cir. 1978), and others, see, e.g., Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc., 204 F.3d 867 (9th Cir. 2000) (applying California law); Pincus v. Pabst Brewing Co., 893 F.2d 1544 (7th Cir. 1990) (applying Wisconsin law).

The right of first refusal must be distinguished from a consent requirement, which requires the dealer (or franchisee) to obtain the written approval of the manufacturer (or franchisor) prior to the sale of the dealership. Both a right of first refusal and a consent requirement provide a mechanism by which the franchisor can control the selection of its franchisees, but a right of first refusal is a less restrictive form of control, as it requires that the franchisor match the terms offered for the franchise by the third party. See Schultze, 579 F.2d at 780 (right protects franchisor "without placing a burden" on franchisee by "creating two prospective purchasers for every offer received by the owner").

In this case, the agreement between GM and Scheidmantel contained both a provision requiring GM's consent to a change in ownership or transfer of the dealership1 and a provision giving GM a right of first refusal.2

_____

1. Section 12.2 of the Agreement provided as follows:

    12.2 Other Changes in Ownership or Management

    If Dealer [Scheidmantel] proposes a change in Dealer Operator, a change in ownership, or a transfer of the dealership business or its principal assets to any person conditioned upon Division's [GM] entering into a dealer agreement with that person, Division will consider Dealer's proposal and not arbitrarily refuse to approve it, subject to the following:

    12.2.1 Dealer agrees to give Division prior wr itten notice of any proposed change or transfer described above. Dealer understands that if any such change is made prior to Division's approval of the proposal, termination of this Agreement will be warranted and Division will have no further obligation to consider Dealer's proposal.

2. Section 12.3.1 of the Agreement provides as follows:

While GM agreed not to arbitrarily withhold its consent to a proposed sale, it expressly retained the right of first refusal at its sole discretion, so long as it matched the purchase price and met the other terms of a bonafide buy-sell agreement between the dealer and a third party. It has been Crivelli's argument that notwithstanding this provision in the contract, GM's exercise of its right of first refusal was subject to the "reasonableness" standard of S 818.9(b)(3) of the Act.

The language of the 1991 version of S 818.9, largely unchanged from the original 1983 version, provides in part that it shall be a violation of the Act for any manufacturer to "[u]nreasonably withhold consent to the sale, transfer or exchange of the franchise to a qualified buyer capable of being licensed as a new vehicle dealer in this Commonwealth." Pa. Stat. Ann. tit. 63, S 818.9(b)(3) (1991) (amended in 1996). The statute was amended in 1996 and this provision, in essentially the same language, was renumbered as S 818.12(b)(3). In order to minimize confusion, we will continue to refer to the section as S 818.9.

The Pennsylvania statute is one of many enacted in various states regulating some aspects of the relationship between motor vehicle manufacturers and their franchised dealers. The provisions of the statutes vary, as do the judicial decisions interpreting them. Their underlying goal, similar to that which motivated the state statutes regulating the franchise relationship generally, is to protect the franchisee who has invested substantial capital in the franchise and who is therefore vulnerable to a manufacturer who may take advantage of this firm-specific

_____

If Dealer submits a proposal for a change of ownership . . ., Division
will have a right of first refusal to purchase the dealership assets
regardless of whether the proposed buyer is qualified to be a dealer.
If Division chooses to exercise this right, it will do so in its written
response to Dealer's proposal. Division will have a reasonable
opportunity to inspect the assets, including real estate, before
making its decision.

Dealer Sales & Service Agreement, Art. 12.3.1.

investment. As the New Jersey Supreme Court explained in Dunkin' Donuts of America, Inc. v. Middletown Donut Corp., 495 A.2d 66, 71 (N.J. 1985), originally a franchise relationship was treated as a common law contractual relationship, and franchise agreements favored the interests of franchisors, particularly with respect to termination. "The effects of termination were starkly simple -the franchisee would be ousted from the franchise, essentially forfeiting his investment. . ." Id. This court has similarly remarked, noting "[t]he franchisee's often substantial specific investment thus creates an opportunity for post-contract opportunistic behavior by the franchisor." New Jersey Am., Inc. v. Allied Corp., 875 F.2d 58, 62 (3d Cir. 1989); see also Morley-Murphy Co. v. Zenith Elecs. Corp., 142 F.3d 373, 374 (7th Cir. 1998) ("Dealers invest in a great deal of firm-specific, or brand-specific, capital, in the goods that they carry, and many states have concluded that this leaves the dealers vulnerable to opportunistic manufacturer behavior . . . .").

Over time, state legislators, recognizing the dissatisfaction with the common-law scheme, "became increasingly sensitive to the plight of franchisees who had devoted considerable time and money towards building a business only to be terminated at the whim of the franchisor." Dunkin Donuts, 495 A.2d at 71. As a result, many states passed statutes that limited cancellation and nonrenewal of a franchise for other than good cause. Id. In light of the extensive investment required for an automobile dealership, it is not surprising that the Pennsylvania legislature followed the national trend and in 1983 enacted the Pennsylvania Board of Vehicles Act. Unlike many other states, Pennsylvania does not have a statute generally applicable to the franchise relationship. Thus, while opinions of other state courts interpreting their statutes may be informative, we must at all times seek to interpret the Pennsylvania Board of Vehicles Act in accordance with that state's intent, insofar as we can ascertain it.

The Act (using section numbers in effect in 1991) establishes the requirements that govern both the continuing relationship between the motor vehicle manufacturer and the dealer, see, e.g., Pa. Stat. Ann. tit.

9

63, S 818.9, and the ability of the manufacturer to unilaterally terminate the franchise or to object to the sale of the franchise, see Pa. Stat. Ann. tit. 63S 818.9(c). Among the provisions that protect the dealer from opportunistic behavior by the manufacturer is S 818.18, which restricts a manufacturer's ability to approve a dealer entering into an existing dealer's market area, and S 818.9(c), which precludes a manufacturer from terminating a franchise except for "just provocation." Moreover, the manufacturer cannot lock a dealer into an unprofitable arrangement by unreasonably withholding its consent to the dealer's sale, transfer or exchange of the franchise to a qualified buyer who can be licensed as a new vehicle dealer. Pa. Stat. Ann. tit. 63 S 818.9(b)(3) (1991).

For purposes of considering the interaction between S 818.9(b)(3) and the manufacturer's contractual right of first refusal, it is significant that until its amendment in 1996, the Board of Vehicles Act contained no reference at all to the right of first refusal. In light of Pennsylvania's prior recognition of a right of first refusal, see, e.g., Steuart v. McChesney, 444 A.2d 659 (Pa. 1982); Warden v. Taylor, 333 A.2d 922 (Pa. 1975); L.E. Wallach, Inc. v. Toll, 113 A.2d 258 (Pa. 1955), there is little reason to believe that the Pennsylvania legislature intended the Act to effect a marked change in prior law.

It would not have been unreasonable for the legislature to have decided to maintain the status quo in that connection. In the first place, there are legitimate reasons why a manufacturer would exercise its right of first refusal. That right may protect the manufacturer from being forced into a business relationship with a franchisee who it believes may not represent it in the manner it desires, may not expend sufficient effort to promote its products, and may not have the loyalty to it and its business that it believes necessary to be an integral part of its operation.

In the second place, a right of first refusal does not entail the risks of post-contractual opportunistic behavior by the manufacturer that the statutes regulating franchise terminations were designated to prevent. See generally Timothy J. Muris, Opportunistic Behavior and the Law of Contracts, 65 Minn. L. Rev. 521 (1981). A dealer interested

10

in selling its operation is not significantly threatened by the manufacturer's exercise of a right of first refusal, so long as the dealer receives at least the same compensation as it would have received from the prospective buyer. Unlike termination or the manufacturer's refusal to consent to the sale of the dealership, a right of first refusal does not destroy the dealer's ability to recover its investment should its relationship with the manufacturer turn sour, should it encounter financial difficulties, or should it decide for personal reasons to go elsewhere. In most instances, the dealer would be largely indifferent to the identity of the new owner.3

There have not been many decisions that consider the effect of a right of first refusal in a somewhat comparable situation. Of the reported opinions on the issue, wefind ourselves most persuaded by the reasoning in Hand v. Chrysler Corp., 30 F. Supp. 2d 667 (D. Vt. 1998). In that case, Chrysler had a Sales and Service Agreement giving it a right of first refusal in the event the dealer decided to sell. It exercised its right of first refusal shortly after it was notified the dealer had entered into an arrangement to sell its assets to the Hands. Chrysler assigned that right to Dorset Motor Co., the dealer consented to the assignment, and the dealer thereafter sold its assets to Dorset. The Hands filed suit against Chrysler alleging, inter alia, that Chrysler's exercise of its right of first refusal was an unreasonable withholding of consent that violated the Vermont Dealers' Act.

The district court granted summary judgment for Chrysler. The court held in the first instance that the

_____

3. This may explain why cases that challenge the exercise of the right of first refusal are generally brought by the disappointed prospective purchaser, rather than the dealer. See, e.g., Blair v. General Motors Corp., 838 F. Supp. 1196 (W.D. Ky. 1993). Although some courts have dismissed such cases on lack of standing, see, e.g., Roberts v. General Motors Corp., 643 A.2d 956 (N.H. 1994); Tynan v. General Motors Corp., 591 A.2d 1024 (N.J. Super. Ct. App. Div.), cert. denied, 606 A.2d 362 (N.J. 1991), and rev'd in part not pertinent here, 604 A.2d 99 (N.J. 1992),
in interpreting the Pennsylvania Act, we held that prospective purchasers have standing. See Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1383 (3d Cir. 1992).

Hands had not established their standing, but that even if they had standing, Chrysler would still have been entitled to judgment because its exercise of the right offirst refusal did not violate the provisions of the Act. The court stated that "Chrysler did not prevent [the dealer] from receiving fair and reasonable compensation for the value of the dealership. [The dealer] received the same price from Dorset Motor Company that it would have received from [the Hands]." Id. at 673. The similarity of the circumstances in the Hand case and the present case is evident.

In language equally applicable here, the Hand court stated:

> Chrysler also properly exercised its right of first refusal and had no obligation to honor the terms of the Asset Purchase Agreement. The validity of that Agreement was contingent on the approval of Chrysler. The Hands assumed the risk and for whatever reason, the Hands were not approved by Chrysler to obtain a sales and service agreement. Consequently, any claims asserted by the Hands that rely on the terms of the Agreement are groundless.

Id.

We agree. Crivelli offers no explanation why the Pennsylvania legislature would turn away from the common law principle of freedom of contract and impose a reasonableness standard on aspects of a private contract between the manufacturer and dealer that, like the exercise of a right of first refusal, presents little, if any, likelihood of harm to the dealer.

Our conclusion that the Act did not limit a motor vehicle manufacturer's exercise of its contractual right offirst refusal is confirmed by the 1996 amendments to the Act. At that time, the Pennsylvania legislature added S 818.16, a new section titled "Manufacturer right of first refusal," which, for the first time, takes cognizance of a right of first refusal. That section provides:

> A manufacturer or distributor shall be permitted to enact a right of first refusal to acquire the new vehicle dealer's assets or ownership in the event of a proposed

12

> change of all or substantially all ownership or transfer
> of all or substantially all dealership assets if all of the
> following requirements are met . . . ."

Pa. Stat. Ann. tit. 63, S 818.16 (1996) (emphasis added).
There are four statutory prerequisites to the manufacturer's
exercise of the right of first refusal.

> (1) . . . the manufacturer . . . must notify the d ealer in
> writing within [60 or 75 days].

> (2) . . . the dealer . . . [will] receiv[e] the same or greater
> consideration as . . . contracted to receive in
> connection with the proposed change of . . . ownership
> . . . .

> (3) The proposed change . . . does not involve . . . a
> designated family member or members . . . of the
> dealer . . . or . . . a qualified manager . . .[who are
> protected should the dealer seek to transfer to them].4

> (4) The manufacturer or distributor agrees to pay the
> reasonable expenses, including reasonable attorney
> fees . . . incurred by the proposed new owner and
> transferee prior to the manufacturer's or distributor's
> exercise of its right of first refusal in negotiating and
> implementing the contract for the proposed change
> . . . .

Title 63, S 818.16.

Crivelli argues that S 818.16 did not effect a repeal of
S 818.9 and should not be used in interpreting the meaning
of the prior provision. We share Crivelli's objection to
placing undue emphasis on the 1996 amendments when
interpreting the intent of the 1983 Pennsylvania legislature
that enacted S 818.9, see United States v. United Mine
Workers of Am., 330 U.S. 258, 282 (1947), and therefore
agree that the subsequent addition of S 818.16 cannot
provide controlling guidance in the interpretation of
S 818.9. However, having already concluded that nothing in
the Act as it stood at the time of the events required that

_____

4. The right of first refusal in GM's agreement with Scheidmantel also
had incorporated terms similar to those in subsections (2) and (3) above,
later included in the amended statute.

the manufacturer provide a reasonable justification for its decision to exercise its right of first refusal, we note that the 1996 amendments reinforce that interpretation.

The 1996 amendments are instructive regarding the scope of S 818.9(b)(3). Nothing in the language of S 818.16, which defines the circumstances under which a manufacturer may now exercise a right of first refusal, suggests that any other provision of the Act may further limit the ability of a manufacturer to exercise its right of first refusal. To the contrary, a persuasive inference can be drawn from the enactment of S 818.16(1) that the 1996 Pennsylvania legislature did not intend S 818.9(b)(3) to govern rights of first refusal.

One of the subsections dealing with the manufacturer's consent to a sale, S 818.9(b)(4), already required the manufacturer to respond in writing to a request for its consent to the sale of the franchise. However, S 818.16(1), dealing with the right of first refusal, also requires the manufacturer to notify the dealer in writing. That section would have been duplicative if, as Crivelli contends, a right of first refusal were considered a withholding of consent under the Act. This evidences that the interpretation Crivelli would have us adopt would conflict with the general instruction in Pennsylvania's Statutory Construction Act of 1972 that "[e]very statute shall be construed, if possible, to give effect to all its provisions." Pa. Stat. Ann. tit. 1, S 1921(a). On the other hand, if, as GM contends, a right of first refusal was not a withholding of consent, the legislature could reasonably have believed that theS 818.16 amendment was necessary to establish the restrictions governing a manufacturer's exercise of its right offirst refusal.

Given the meaningful and clear dissimilarities between a consent requirement and a right of first refusal, we accordingly predict that the Pennsylvania Supreme Court would hold that the exercise of a right of first refusal is not a withholding of consent.5 Therefore GM was not required

_____

5. The District Court referred to In re Headquarters Dodge, Inc., 13 F.3d 674 (3d Cir. 1994), a case that arose under the New Jersey Franchise

14

by S 818.9(b)(3) to justify its decision to the jury to enforce its contractual right of first refusal. It follows that the District Court erred as a matter of law in denying GM's post-trial motion for judgment on the statutory count.

B.

Intentional Interference with a Contract

Because Crivelli's jury verdict and judgment were premised on the Pennsylvania tort of intentional interference with a contractual relation as well as the Board of Vehicles Act, our decision that the statute cannot support the judgment requires us to determine whether the judgment can be sustained on the basis of the tort.

Under Pennsylvania law, the elements of a cause of action for intentional interference with a contractual relation, whether existing or prospective, are:

> (1) the existence of a contractual, or prospective
> contractual relation between the complainant and a

_____

Practices Act (herein "FPA") not the Pennsylvania Act at issue here. The FPA required a franchisor -- after receiving a proposal from a current franchisee to transfer, assign, or sell a franchise to another person -- to either approve the proposal or notify the franchisee of its decision to disapprove, setting forth the "material reasons relating to the character, financial ability or business experience of the proposed transferee." N.J. Stat. Ann. S 56:10-6 (West 1989). GM exercised its contractual right of first approval when a bankrupt GM dealer sought its consent to transfer the dealership. The dealer and its proposed transferee filed suit against GM, alleging it acted unreasonably or in bad faith because it changed its reasons and the reasons given were not accurate. Relying on dictum in Simmons v. General Motors Corp., 435 A.2d 1167, 1177 (N.J. Super. Ct. App. Div. 1981), we held that the FPA "impose[s] a requirement of reasonableness on a franchisor's decision to disapprove a transfer" and accordingly reversed the grant of summary judgment as the plaintiffs had presented a genuine issue of material fact as to the reasonableness of GM's disapproval. Headquarters Dodge, 13 F.3d at 681. In light of the different statutes at issue, however, that case does not support the conclusion that the Pennsylvania Act imposes a requirement of reasonableness on GM's decision to exercise its right of first refusal, nor has Crivelli so argued on appeal.

15

third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.

Strickland v. University of Scranton, 700 A.2d 979, 985 (Pa. Super. Ct. 1997) (citations omitted). Pennsylvania has expressly adopted the Restatement (Second) of Torts, which states that a necessary element of this tort is improper conduct by the alleged tortfeasor, here GM. See Adler, Barish, Daniels, Levin & Creskoff v. Epstein, 393 A.2d 1175, 1183 (Pa. 1978); Restatement (Second) of Torts SS 766–67.

The Restatement also sets forth the following factors to consider when determining whether the interference is improper:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.

Restatement (Second) of Torts S 767.

The general issue is "whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another." Adler, 393 A.2d at 1184 n.17 (quoting Restatement (Second) of Torts S 767 cmt. b). According to one of the Restatement's comments, the "nature of the actor's conduct is a chief factor" in determining whether the conduct is improper. Restatement (Second) of TortsS 767 cmt. c. It gives illustrative examples of improper conduct actions, such as threats of physical violence, fraudulent misrepresentations, threats of unmerited civil or criminal litigation, economic pressure, and unlawful conduct. See id. The conduct Crivelli attacks by its tort claim, GM's decision to exercise its right of first refusal, is not comparable to any

16

of those examples and, as we have just decided, violated no statute, regulation, or governing judicial decision.

Although the Pennsylvania Supreme Court has not yet addressed the circumstances presented in this case, other courts have held that a company's exercise of a right of first refusal cannot ordinarily give rise to a claim of intentional interference with a contract. See Roberts, 643 A.2d at 960–62; Tynan, 591 A.2d at 1034; cf. Noller v. GMC Truck & Coach Div., General Motors Corp., 772 P.2d 271, 276–77 (Kan. 1989) (manufacturer who agreed with franchisee not to withhold consent arbitrarily had no duty to prospective purchaser who was merely an incidental beneficiary of the agreement); Morse v. Ted Cadillac, Inc., 537 N.Y.S.2d 239, 240 (N.Y. App. Div. 1989) (manufacturer did not interfere with prospective purchaser's contractual relations by refusing to enter into franchise agreement).

Crivelli relies on our decision in Big Apple BMW, Inc. v. BMW of North Am., Inc., 974 F.2d 1358, 1381–82 (3d Cir. 1992), that the withholding of consent pursuant to a franchise agreement may constitute improper interference if the action violated the Pennsylvania Board of Vehicles Act. However, the franchisor in that case did not assert a contractual right of first refusal whereas here GM asserted a bona fide right of first refusal designed to protect its interest in its franchise. Thus, GM's action falls within Restatement S 773, which provides, "[o]ne who, by asserting in good faith a legally protected interest of his own . . . intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction." Restatement (Second) of Torts S 773.

While GM's exercise of its contractual right offirst refusal necessarily interfered with the purchase agreement between Crivelli and Scheidmantel, it does not subject GM to liability for interfering with their contract. See Ruffing v. 84 Lumber Co., 600 A.2d 545, 548 (Pa. Super. Ct. 1991) ("[A]n actor is privileged to interfere with another's performance of a contract when: (1) the actor has a legally protected

17

interest; (2) he acts or threatens to act to protect the interest; and (3) the threat is to protect it by proper means.") (citing Gresh v. Potter McCune Co. , 344 A.2d 540, 542 (Pa. Super. Ct. 1975)).

Crivelli "concedes that any franchisor has an interest in the identity of its franchisees . . . . [and] further concedes that absent the statute, GM would be free to exercise its right of first refusal . . . for any good faith reason it so desired." Appellee's Br. at 47. The only basis on which Crivelli defends its claim of intentional interference with a contract is its argument that after the enactment of the Board of Vehicles Act the "rules of the game" changed and "GM no longer had a privilege to act in an unfettered manner." Id. Because we have already decided that S 818.9(b)(3) of the Act does not apply to GM's exercise of its right of first refusal, we predict that the Pennsylvania Supreme Court would conclude that, as a matter of law, the exercise of a right of first refusal by GM did not constitute an improper action within Pennsylvania's tort of intentional interference with a contractual relationship. Accordingly, Crivelli's tort claim should also have been dismissed.

IV.

CONCLUSION

Because of our holding that GM must prevail on Crivelli's statutory claim and intentional interference with a contract claim, we need not consider the various other issues GM raised on appeal. For the reasons set forth, we will reverse the District Court's denial of judgment to GM as a matter of law and will direct it to enter judgment for the defendant on both counts of the complaint. Each party to bear its own costs.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit