NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 04-1849

———————

MICHAEL CRAWFORD; STEVEN BELLI;
DIRK FLOTE; RAECO INVESTMENT PARTNERSHIP,

Appellants

v.

SAP AMERICA, INC.; SAP AG; HASSO PLATTNER

———————

Appeal from the United States District Court
for the Eastern District of Pennsylvania,
(D.C. Civ. No. 00-CV-02779-JPF)
District Judge: Honorable John P. Fullam

———————

Argued January 10, 2005

Before: ROTH and CHERTOFF[*], Circuit Judges,
RESTANI[**], Judge, United States Court of International
Trade

(Filed: April 7, 2005)

———————

[*] This case was submitted to the panel of judges Roth, Chertoff, and Restani. Judge Chertoff resigned after submission, but before the filing of the opinion. The decision is filed by a quorum of the panel. 28 U.S.C. § 46(d).

[**] Honorable Jane A. Restani, Chief Judge of the United States Court of International Trade, sitting by designation.

Don P. Foster, Esq. (Argued)
Mary E. O'Laughlin, Esq.
Klehr, Harrison, Harvey,
Branzenburg & Ellers
260 South Broad Street
Suite 400
Philadelphia, PA 19102

*Counsel for Appellants*

Kell M. Damsgaard, Esq. (Argued)
Emily J. Lawrence, Esq.
Morgan, Lewis & Bockius
1701 Market Street
Philadelphia, PA 19103

*Counsel for Appellees*

---

OPINION

---

RESTANI, <u>Judge</u>:

This diversity action revolves around the relationship between Defendant SAP America, Inc., and Data Dynamics, Inc., formerly one of SAP America's regional software solutions providers, as well as Data Dynamics' successor-in-interest, Titan Technologies Group, LLC. Plaintiffs, former holders of interests in Data Dynamics and/or Titan, brought contract, tort, and statutory claims against SAP America as well as its parent company, SAP AG, and the former chairman of both companies, Hasso Plattner. On Defendants' summary judgment motion, the district court concluded that

Plaintiffs lacked standing to claim that Defendants fraudulently induced Titan into a license agreement and later breached it. The district court then rejected Plaintiffs' New Jersey Franchise Practices Act, N.J. Stat. Ann. §§ 56:10–1 to 56:10–29 (West 2001) ("NJFPA"), and tortious interference claims, which related to Plaintiffs' unsuccessful efforts to sell Titan to Modis Professional Services, Inc. See Mem. & Order, No. 00–2779, 2004 U.S. Dist. LEXIS 6241 (E.D. Pa. Mar. 2, 2004). We affirm.

## BACKGROUND

In March 1997, Data Dynamics and SAP America entered into the Provider Agreement, which granted a license to Data Dynamics to act as SAP America's exclusive sales agent to smaller businesses in parts of New York and New Jersey. The Provider Agreement restricted the ability of the provider to be acquired, in whole or in part, only if the aquiror owned or marketed a product competitive with SAP's software. [See Provider Agt. at sec. 16.2(d)(ii), App. vol. VIII at A2100.] In June 1997, the Provider Agreement was assigned to Titan, a new entity created by the shareholders of Data Dynamics to perform the undertakings contemplated by the Provider Agreement. Near the end of the year, SAP America awarded Titan additional sales territory, including southern New Jersey and eastern Pennsylvania. [Complaint at 19; App. vol. II at A54.]

In the latter half of 1998, Plaintiffs sought to sell their ownership interests in Titan to Modis. Titan President Michael Crawford notified SAP America of this intent in a letter to Senior Vice President John Burke, dated October 20, 1998. [App. vol. VIII at

3

A2242.] The parties dispute how SAP's management responded to Plaintiffs' efforts to sell to Modis. All agree that on December 23, 1998, Burke called Timothy Payne at Modis to discuss the proposed acquisition of Titan and that, shortly after this call, Payne recommended to Modis's chairman that the transaction not be consummated. The chairman followed this recommendation. [Payne Dep., App. vol. V at A1339–A1340.]

A few months after the collapse of the Modis transaction, Plaintiffs sold their ownership interests in Titan to another firm, Condor Technology Solutions, Inc. Plaintiffs then brought this action, asserting numerous claims arising out of their relationship with Defendants. Plaintiffs' Fourth Amended Complaint asserts various claims, including violations of the NJFPA, fraudulent inducement, breach of contract, and interference with prospective economic advantage. [Complaint, App. vol. II at A36.] The district court granted summary judgment for Defendants on all counts. Plaintiffs appeal.

## DISCUSSION

### I. PLAINTIFFS FAIL TO ESTABLISH NJFPA CLAIMS

The parties dispute whether this action is governed by Pennsylvania or New Jersey law. The only potentially relevant difference between the laws of the two states is whether New Jersey's franchise law, the NJFPA, governs the relationship between the parties. An extended conflict of laws inquiry is not warranted because Plaintiffs fail to establish viable claims on the basis of NJFPA Sections 6, 7(d), and 7(e). Cf. Suchomajcz v.

4

Hummel Chemical Co., 524 F.2d 19, 23 (3d Cir. 1975) ("If both Pennsylvania and New Jersey would apply the same substantive tort law to [defendant's] activities, deciding which state's law to apply obviously is unimportant."); Paoletto v. Beech Aircraft Corp., 464 F.2d 976, 982 (3d Cir. 1972) ("We hold, therefore, that the choice of law problem broached by the parties is in reality a false conflict, and that appellant's cause in this appeal cannot be sustained under the laws of either state.").

The district court assumed that the Provider Agreement established a franchise within the meaning of the NJFPA. No. 00–2779, 2004 U.S. Dist. LEXIS 6241, at *7. We assume arguendo the same.[1]

Plaintiffs' Section 6 claim is muddled. They argue that Defendants violated Section 6 by interfering with the Modis transaction after the 60-day period for objection but apparently do not seek a remedy. See Pls.' Reply Br. at 18.[2] The remedy for a

_____

[1] We do retain some doubts, however, as to whether the parties' relationship included the community of interest necessary for a franchise. See N.J. Stat. Ann. § 56:10–3; Instructional Sys. v. Computer Curriculum Corp., 130 N.J. 324, 359 (1992) (defining community of interest as requiring the franchisee "to make a substantial investment in goods or skills that will be of minimal utility outside the franchise."). One Plaintiff, RAECO, was the sole investor of initial capital in Titan, providing $500,000. RAECO principals understood Titan to have significant value outside the provider relationship with SAP: "If for some reason either SAP or [Data Dynamics] decided not to renew the contract, [Data Dynamics] feels that they would be left with a viable SAP consulting services group. Since there are no rules that can restrict a firm from providing SAP consulting services to companies, [Data Dynamics] feels the company's future would remain intact." [App. vol. VIII at A2128]. Finally, the extent of Plaintiffs' investment in non-transferrable goods or skills is limited by the fact that, within a year-and-a-half of Titan's formation, they began to shop the entity to Modis.

[2] At oral argument, Plaintiffs attempted to explain their Section 6 claim as establishing that Defendants tortiously interfered with the Modis transaction, but this argument does nothing to address the fatal flaw in the tortious interference claim. See infra at Part III.

5

franchisor's failure to object to a franchisee's proposed transfer within 60 days of notice is specific performance rather than damages, <u>VW Credit, Inc. v. Coast Auto. Group. Ltd.</u>, 787 A.2d 951, 961 (N.J. Super. Ct. App. Div. 2002), but specific performance of the proposed Modis transaction was precluded by the sale of Titan to Condor. Because Section 6 affords Plaintiffs no remedy, their claim is moot.

Section 7(d) only prohibits restrictions on those sales or transfers of franchise interests that did not "have the effect of accomplishing a sale of the franchise." <u>See</u> N.J. Stat. Ann. § 56:10–7(d) (1971); <u>see also</u> <u>Simmons v. General Motors Corp., Oldsmobile Div.</u>, 435 A.2d 1167, 1178–79 (N.J. Super. Ct. App. Div. 1981) ("Restrictions on the transfer of securities of a franchisee are prohibited unless the transfer would have the effect of selling the franchise."). The Modis deal clearly amounted to a proposed sale of the franchise, as demonstrated by Titan President Crawford's letter to Burke of SAP America, which informed him that Plaintiffs "have received an offer from [Modis] to purchase Titan." [A2242]. Accordingly, any purported interference by Defendants with regard to the Modis deal is not actionable pursuant to Section 7(d).

We do not consider the Section 7(e) claim that Plaintiffs submit on appeal. Plaintiffs raised Section 7(e) for the first time in their response to SAP's Motion for Summary Judgment, Docket No. 93, but never sought leave to amend their complaint. <u>See</u> Fed. R. Civ. P. 15(a). The district court properly did not address this allegation in its decision, and it would be inappropriate on appeal to consider this claim for the first time.

6

See Srein v. Frankford Trust Co., 323 F.3d 214, 224 (3d Cir. 2003) (refusing to consider arguments raised for the first time on appeal absent "compelling reasons").

## II.    PLAINTIFFS LACKED STANDING TO ASSERT CLAIMS ON BEHALF OF TITAN

Plaintiffs lacked standing to assert breach of contract and fraudulent inducement claims on behalf of Titan. "An injury to a corporation may, to be sure, result in injury to the corporation's stockholders. Such injury, however, is regarded as 'indirect', and insufficient to give rise to a direct cause of action by the stockholder." Burdon v. Erskine, 401 A.2d 369, 370 (Pa. Super. Ct. 1979) (citing Kelly v. Thomas, 83 A. 307, 310 (Pa. 1912)).

As the district court observed, Data Dynamics was the initial party to the Provider Agreement with SAP, and any breach or wrongful inducement injured Data Dynamics or its assignee, Titan. See Mem. & Order at *3. Only one of the Plaintiffs, Crawford, signed the Provider Agreement and the Assignment, and he did so as President for Data Dynamics and Titan.

Plaintiffs also fail to establish standing as third–party beneficiaries. No explicit third–party obligation appears in the Provider Agreement or the Assignment, and there is no compelling evidence that, by entering into those contracts, the parties intended to give legally enforceable rights to the Plaintiffs. See Scarpitti v. Weborg, 609 A.2d 147, 150–51 (Pa. 1992) (recognizing implied third party standing only where, in addition to

7

other factors, "the circumstances are so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties").

## III. PLAINTIFFS' TORTIOUS INTERFERENCE CLAIM FAILS FOR LACK OF DAMAGES

In Pennsylvania, "actual legal damage" is one of the four elements required to show intentional interference with prospective economic relations. Crivelli v. GMC, 215 F.3d 386, 394 (3d Cir. 2000) (quoting Strickland v. University of Scranton, 700 A.2d 979, 985 (Pa. Super. Ct. 1997)). New Jersey imposes a similar requirement. See Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1176 (3d Cir. 1993); cf. Waschel v. King Tour & Travel Servs., 43 Pa. D. & C.4th 52, 56 (Pa. D. & C. 1999) ("if the laws of Pennsylvania and New Jersey are substantively the same, no conflict exists and either state's law may be applied.").

The district court found no provable damages on the basis that Plaintiffs fared better in the completed Condor transaction, which the court valued at about $9 million, than in the failed Modis transaction, which the court valued at about $5 million. In valuing the Modis transaction at $5 million, the district court recognized the $4.5 million initial payment and the $500,000 secondary payment, [App. vol. IX at A2288], but did not assign a value to the "earn–out" provisions, i.e., performance incentives that held out the possibility of substantial payments to Plaintiffs but in fact were never met. [App. vol. IX at A2278.] In valuing the Condor transaction, on the other hand, the district court used the $9 million closing price mentioned in the transaction contract, which included a

guaranteed cash payment, certain earn–out provisions, and restricted Condor stock valued initially at $1.95 million, but which was worth only $119,069 by the time the restrictions lifted. Nevertheless, even without incentives and stock, the Condor transaction had a guaranteed value of $6.55 million, [A2437–A2439], still greater than the $5 million contemplated by the Modis transaction. [A2288.]

In calculating damages, the district court rejected as speculative the report of Plaintiffs' expert and observed in passing that the report was inadequate under the standard prescribed in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593 (U.S. 1993). See Mem. & Order at *12–13. Plaintiffs proffered their expert's report to support the proposition that, had Defendants not interfered, Modis would have invested additional sums in Titan that would have made Titan eligible for earn–out payments that, when added to the down payment, would have surpassed the value of the Condor transaction. In this vein, Plaintiffs' expert asserts that, based on a number of assumptions, the Modis transaction would have been worth at least $11,490,000, consisting of down payment plus earn–out.

Because Plaintiffs' damages theory depends upon what would have happened if the Modis transaction had been consummated, their expert faced the task of addressing how Modis's involvement would have affected Titan's financial performance. Plaintiffs' expert, however, had no pre-existing knowledge of Modis and failed to familiarize himself with the company. In short, the expert's model bears little or no relationship to

9

what, specifically, Modis would have contributed to Titan's earnings potential.  Even if a Daubert inquiry would have revealed that Plaintiffs' expert used reliable methods in reaching his conclusions, his conclusions would be of little or no use to the trier of fact, who would be left to speculate as to whether Modis's involvement in Titan's business would have enabled Titan to meet the earn–out incentives contemplated by the Modis transaction.  Accordingly, the district judge did not err in rejecting Plaintiffs' hypothetical damage claims in favor of data pertaining to Titan's actual performance in 1999 and 2000.  See Advent Sys. Ltd. v. Unisys Corp., 925 F.2d 670, 682 (3d Cir. 1991) ("We . . . have serious reservations about the validity of expert testimony based on prior predictions of sales for a given period when actual performance data for that same time span are available.").

## CONCLUSION

For the foregoing reasons, the district court's summary judgment in favor of Defendants is

AFFIRMED.