**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-2072
_____

AUDI OF AMERICA, An Organization Unit of Volkswagen Group of America, Inc., A
New Jersey Corporation;

v.

BRONSBERG & HUGHES PONTIAC, INC., DBA Wyoming Valley Audi,

NORTH AMERICAN AUTOMOTIVE SERVICES, INC.; NAPLETON
WYOMING VALLEY IMPORTS, LLC; EFN WYOMING VALLEY PROPERTIES,
LLC; MILLENNIUM HOLDINGS, IV, LLC; NAPLETON INVESTMENT
PARTNERSHIP, LP,

                                Appellants
                                (Intervenors in District Court)

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 3-16-cv-02470)
District Judge: Honorable John E. Jones, III
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
April 2, 2020

Before: GREENAWAY, JR., PORTER, and MATEY, *Circuit Judges*.

(Filed: June 4, 2020)

_____

OPINION[*]
_____

MATEY, *Circuit Judge*.

North American Automotive Services, Inc., and its affiliated companies (collectively "Napleton") allege Audi of America ("Audi") got in the way of an agreement to open a new car dealership. But, as the District Court concluded, Audi offered ample justifications for invoking its contractual rights. For that reason, we will affirm the District Court's grant of summary judgment against Napleton.

## I. BACKGROUND

Although we write only for the parties, even our limited review of the facts requires a long drive across miles of deception. Audi imports and distributes Audi vehicles, operating as a division of Volkswagen Group of America, Inc. ("VWGoA"). Since 1997, Audi had a franchise agreement (the "Franchise Agreement") with Wyoming Valley Motors ("WVM"), a Pennsylvania dealer.[1] The Franchise Agreement gave WVM the right to sell and service Audi vehicles only at a particular, specified location. It also gave Audi the right to sign off on significant changes to WVM's business including any proposed transfer of its "principal assets or change [in] owners."[2] (App. at 391–92.)

_____

[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.
[1] WVM is not a party to this appeal.
[2] The Pennsylvania Board of Vehicles Act governs this agreement. 63 Pa. Cons. Stat. § 818.1 (renumbered as § 818.101). The Act allows a contractual right of first refusal if, among other things, a distributor notifies the dealer in writing within a specified time,

2

All was well until Audi informed WVM that franchise locations must become exclusive Audi dealerships, or risk losing financial incentives.[3] That posed a problem for WVM, which operated its Audi dealership at a facility shared with several other dealerships. So WVM bought property at a new location (the "Relocation Property") to house a new Audi showroom. But WVM also planned to exit the car business by selling its dealerships, real properties, and liabilities to Napleton, a large multi-state dealership group. To facilitate the sale, Napleton and WVM drafted an Asset and Real Estate Purchase Agreement ("APA") valuing the total combined assets at $17 million. The APA required that WVM obtain written consent from its distributors, including Audi, allowing Napleton to move the dealerships to the Relocation Property.

WVM formally requested Audi's approval of the relocation plan, but, fearing transparency, did not mention the APA or Napleton. The plan worked, and Audi agreed to the relocation, conditioned on, among other things, WVM maintaining ownership (the "Relocation Agreement"). But Audi retained the right to revoke the Relocation Agreement if WVM "fail[ed] to perform any of the terms and conditions of this Agreement." (App. at 933.) With Audi's approval in hand, WVM finally disclosed the APA.

---

and the distributor is willing to "assume the dealer's lease . . . on the same terms as those on which the real property or lease was to be sold." 63 Pa. Cons. Stat. § 818.16(2)(i) (renumbered as § 818.315(a)(2)(i)). The Act also prohibits a distributor from "unreasonably withhold[ing] consent" to a sale, transfer, or relocation. *Id.* § 818.12(b)(3)–(4) (renumbered as § 818.310(b)(3)–(4)).

[3] This change was not a surprise. In 2011, Audi outlined the new policy and gave WVM until 2017 to transition its facility.

Audi was not pleased. It warned WVM and Napleton that "[a]ny actions taken . . . in anticipation of [Audi's] consenting to the proposed acquisition . . . [were] strictly at their own business risk," and started searching for buyers for all of WVM's assets in the APA. (App. at 878.) That prompted Audi to ask WVM for a "good faith break-down" of the terms of the APA attributable to Audi's assets. (App. at 885.) WVM responded with a break-down that, it acknowledged, did not precisely "determine the separate value of [Audi's] assets."[4] (App. at 980.)

Audi then filed a breach of contract action against WVM asking for injunctive relief to prevent the transfer outlined in the APA. In response, WVM and Napleton amended the APA to drop the Audi dealership from the deal. But not really, as the profits from the Audi dealership would still flow to Napleton courtesy of "management fees." (App. at 1263–64.) Persuaded that Audi faced irreparable harm, the District Court granted Audi a preliminary injunction.

Undeterred, WVM then transferred its interest in the Relocation Property to an intermediary retained by Napleton. They hid that agreement too. Once discovered, Audi notified WVM that it was rescinding the Relocation Agreement (the "Rescission Notice"). The Rescission Notice left open the possibility that Audi would consider a different relocation request with the same property but made clear that WVM needed to unwind the deal with Napleton. Instead, Napleton intervened in the litigation bringing various counterclaims against Audi, including tortious interference. At WVM's request, the

---

[4] Nor was WVM's calculation accurate because, when combined with allocations it provided for two other distributors, the figures surpassed the $17 million valuation.

4

District Court issued an order permitting WVM to transfer the non-Audi and non-Volkswagen assets to Napleton but also requiring Napleton to "forever quit its interest" in owning the Audi and Volkswagen assets and maintain the status quo during litigation. (App. at 147.)

Meanwhile, work on the new facility at the Relocation Property marched on, with Napleton and WVM inking yet another deal to relocate the disputed Audi dealership there on completion. And, predictably, neither disclosed this agreement despite a status conference before the District Court three days later. Once notified, the District Court invalidated the transfer.[5]

Audi ultimately moved for summary judgment, which the District Court granted against all of Napleton's tortious interference claims. It held that Napleton had not shown Audi acted without cause and, for two claims, could not prove causation and damages.[6] Now, Napleton appeals, and we will affirm.[7]

---

[5] An interlocutory appeal by Napleton and WVM brought the matter briefly here, but we remanded at Audi's request.

[6] Only the tortious interference claims remain. Napleton originally brought eight counterclaims, but the other four claims have been dismissed (Counts I, II, VII, and VIII). The District Court dismissed one of WVM's counterclaims as well; its other counterclaim has been settled.

[7] The District Court had jurisdiction under 28 U.S.C. § 1332 and 28 U.S.C. § 1367, and we have jurisdiction under 28 U.S.C. § 1291. Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[R]eview of a grant of summary judgment is plenary." *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 211 (3d Cir. 2009).

## II. DISCUSSION

To prevail on its tortious interference claims, Napleton must show, among other things, that Audi's conduct was not "privilege[d] or justifi[ed]." *Crivelli v. Gen. Motors Corp.*, 215 F.3d 386, 394 (3d Cir. 2000) (quoting *Strickland v. Univ. of Scranton*, 700 A.2d 979, 985 (Pa. Super. Ct. 1997)). That turns on "whether the defendant's conduct is sanctioned by the rules of the game which society has adopted." *Phillips v. Selig*, 959 A.2d 420, 430 (Pa. Super. Ct. 2008) (internal quotation marks omitted). And our analysis gives "substantial deference to defendants" when their conduct "protects an existing legitimate business concern." *Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 665 (3d Cir. 1993).

### A. The APA

Napleton raises a host of arguments about Audi's conduct under the APA, but each act is justifiable given Audi's right of first refusal.

First, Napleton points to Audi's request for a price break-down of the APA, but that was a necessary first step in determining whether to exercise its rights. Without a price for the Audi assets, Audi did not have the option of "assum[ing] the dealer's lease . . . on the same terms as those on which the real property or lease was to be sold," as guaranteed by its right of first refusal. 63 Pa. Cons. Stat. § 818.16(2)(i) (renumbered as § 818.315(a)(2)(i)). Likewise, Audi's effort to find potential buyers for all WVM's assets was a logical next step. Relatedly, Napleton suggests it was improper for Audi to tell WVM it would need to withdraw from the entire APA. But again, context shows Audi did not have feasible alternatives. WVM thwarted Audi's prior attempt to exercise its right of first

6

refusal. Its attempts to avoid the difficulty through outside help had reached a dead end. Justifiably, the only remaining path to protect its rights was to refuse the deal.

Napleton also raises two arguments under the Pennsylvania Board of Vehicles Act, neither with much merit. First, it contends that Audi "unreasonably withh[e]ld consent." 63 Pa. Cons. Stat. § 818.12(b)(3)–(4) (renumbered as § 818.310(b)(3)–(4)). That does not address Audi's right of first refusal, and that right is enough to justify Audi's conduct. *See Crivelli*, 215 F.3d at 390. Second, Napleton claims Audi did not exercise its right of first refusal in time. But the only basis for that argument is Audi's decision to not exercise the right pending litigation, a decision protected by the *Noerr-Pennington* doctrine.[8] *See, e.g.*, *We, Inc. v. City of Philadelphia*, 174 F.3d 322, 326–27 (3d Cir. 1999); *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 122 (3d Cir. 1999) (holding "immunity extends to persons who petition all types of government entities—legislatures, administrative agencies, and courts").

Finally, Napleton accuses Audi of working against the APA to punish Napleton for its past litigation in a diesel emissions suit. True, the APA would have transferred WVM's rights in a lawsuit between Volkwsagen dealers, including Napleton as the lead litigant, and Audi's parent company, VWGoA. But as the District Court explained, there were many reasons Napleton was not an ideal partner for Audi. Napleton had been involved in other litigation against Audi and at least one other manufacturer and had tried to keep Audi in

---

[8] Napleton would also struggle to show causation for this timing issue because the District Court's various orders to maintain the status quo were seemingly an intervening cause of any delay.

the dark about the APA. As the District Court properly concluded, the justifications for Audi's conduct requires consideration of all "the circumstances presented."[9] *Phillips*, 959 A.2d at 429. Audi's right to "control the selection of its franchisees" would prove hollow if forced to accept Napleton under these conditions. *Crivelli*, 215 F.3d at 390. For all these reasons, Audi's conduct was proper.

## B.    The Relocation Agreement

Napleton also alleges that Audi acted in bad faith in rescinding the Relocation Agreement. The core of this argument is timing: Audi always knew it would decline to approve the proposed relocation, but it waited until Napleton had constructed most of the new facility. Napleton's argument is unpersuasive. Audi only learned about the details of WVM's plans with Napleton after approving the Relocation Agreement. Once aware of that deal, Audi warned WVM and Napleton that the Relocation Agreement might not stand. And, once Audi discovered the property transfer to Napleton's intermediary, it timely disapproved.[10] On those facts, there is no evidence on which "a reasonable jury could return a verdict for the nonmoving party," making summary judgment for Audi proper. *Sovereign*

---

[9] Impropriety tuns on the factors in Restatement (Second) of Torts § 767 (1979) including "(a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the others with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties." *Phillips*, 959 A.2d at 429–30.

[10] And as noted, much of Audi's alleged misconduct occurred as part of ongoing litigation. *We, Inc.*, 174 F.3d at 326–27.

*Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 172 (3d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

### III.  CONCLUSION

For these reasons, we will affirm the District Court.