**Ellen C. MARSHALL, Plaintiff,**

v.

**Ronald FENSTERMACHER, High Swartz Roberts and Seidel, Emma Dawson, David Burgess, Hetherington & Company, Defendants.**

No. Civ.A. 04–3477.

United States District Court, E.D. Pennsylvania.

Aug. 23, 2005.

Clark E. Alpert, Alpert, Butler & Sanders PC, West Orange, NJ; David H. Weinstein, Robert S. Kitchenoff, Weinstein, Kitchenoff, Asher, LLC, Philadelphia, PA, for Plaintiff.

Arthur W. Lefco, Cynthia L. Brennan, Jason B. Schaeffer, Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, PA, and Hillary Ann Fraenkel, Roseland, NJ, for Defendants.

### Memorandum and Order

PRATTER, District Judge.

Defendants Ronald Fenstermacher and High Swartz Roberts and Seidel move to dismiss the claims against them in this action alleging various claims related to allegedly fraudulent conduct. For the reasons discussed below, the motion will be granted in part and denied in part.

### FACTS AND PROCEDURAL BACKGROUND

The complaint in this case arises from several alleged schemes to prevent the Plaintiff, Ellen Marshall, from collecting a debt owed to her by Warren Matthei.[1]

---

1. The Court notes that it received a letter with respect to this case from Kathy A. Stark, Assistant United States Attorney, dated January 20, 2005. Ms. Stark indicated that "[t]he issues to be litigated in this civil matter may have a direct bearing" on a criminal action against Mr. Matthei related to the non-payment of child support obligations pending in the United States Court for the District of New Jersey. Ms. Stark indicated that the

Ms. Marshall is an attorney who represented Mr. Matthei in 1992 with respect to his divorce from his first wife, Ms. Kelley. In late 1993, Mr. Matthei allegedly received a large settlement from a separate lawsuit. Although he apparently was advised that the settlement would have to be shared with Ms. Kelley, it seems that Mr. Matthei took the money, moved to the United Kingdom, and is alleged to have used it to purchase a flat in London and to establish Lepanto, a corporation formed under Bahamian law. In January 1994, after Mr. Matthei stopped paying alimony and child support, a bench warrant was issued by the New Jersey Superior Court, Law Division, Civil Part (the "New Jersey Superior Court"), for his arrest. In December 1995, Mr. Matthei apparently married Emma Dawson, and the two allegedly entered into a pre-nuptial agreement, the terms of which would transfer all of Mr. Matthei's assets, including the flat and his interest in Lepanto, to Ms. Dawson. However, Mr. Matthei was arrested in August of 1996 when he tried to re-enter the United States. An ability-to-pay hearing was held that same month in the New Jersey Superior Court, and Mr. Matthei was incarcerated after the court concluded that Mr. Matthei had received $2.74 million from a lawsuit settlement and was in arrears in his alimony and child support obligations. *Marshall v. Matthei*, 327 N.J.Super. 512, 744 A.2d 209, 212 (2000).

■ In addition to not paying alimony or child support, Mr. Matthei never paid

Ms. Marshall for the legal services that she provided with respect to his divorce from Ms. Kelley. As a result, Ms. Marshall sued Mr. Matthei in New Jersey Superior Court and, in April 1995, obtained a default judgment against him. In September of 1996, Ms. Marshall filed an application for a writ of *capias ad satisfaciendum*,[2] and a hearing on the application was held on October 10, 1996. The *capias* court concluded that Mr. Matthei had conveyed his property with the intent to defraud his creditors and had refused to apply available assets to pay Ms. Marshall's judgment. *Marshall*, 744 A.2d at 212. The court therefore issued the writ. *Id.*

In August of 1998, the court released Mr. Matthei from incarceration for the non-payment of alimony. However, Mr. Matthei was not released from "incarceration imposed under any presently pending criminal matter or other civil matters," including the *capias* bond.[3] A few months later, Mr. Matthei moved to dismiss the *capias* writ, arguing that the writ had no coercive effect and had become punitive in nature. *Marshall*, 744 A.2d at 213. At a hearing on the matter, the court disagreed and, noting that dismissal of the writ would not release Mr. Matthei from incarceration regarding some criminal charges, denied the request to dismiss the writ. *Id.*

Mr. Matthei was released from jail with respect to the criminal charges in August of 1999. *Id.* Upon learning of his release,

government was in the process of evaluating the circumstances to assess whether it would intervene in this action. As of the date of this Memorandum and Order, no further correspondence has been received by Ms. Stark and no intervention motion has been filed.

2. A *capias ad satisfaciendum* is a "body execution" that enables a judgment creditor, under certain circumstances, to effect the arrest of a judgment debtor until the judgment debtor either pays the judgment or is discharged

as insolvent. *Marshall v. Matthei*, 327 N.J.Super. 512, 744 A.2d 209, 217 (2000).

3. According to the parties' counsel at oral argument, Mr. Matthei is presently incarcerated at a correctional facility in Essex County, New Jersey. *Oral Arg. Trans.* at 12:14–16. The parties agree that at the time the allegedly fraudulent actions were committed, Mr. Matthei was incarcerated at the Federal Detention Center located in Philadelphia, Pennsylvania.

the court that had issued the *capias* writ held another hearing on the writ, and concluded that because Mr. Matthei's continued incarceration would have a punitive rather than a coercive effect, Mr. Matthei should be released. *Id.* Ms. Marshall appealed the court's ruling, and in January of 2000, the New Jersey Superior Court reversed the order releasing Mr. Matthei on the grounds that the law required Ms. Marshall be given an opportunity to "test the veracity and credibility of the proofs offered in support of the petition" for release. *Id.*

In this case, the list of Defendants does not include Mr. Matthei. Rather, Ms. Marshall is pursuing claims against: (1) Ronald Fenstermacher, Esquire, an attorney who represented Mr. Matthei with respect to transferring assets to Ms. Dawson, apparently after a divorce proceeding which originated in the United Kingdom; (2) High Swartz Roberts and Seidel, a Pennsylvania Limited Liability law partnership, at which Mr. Fenstermacher[4] was employed as an associate attorney; (3) Ms. Dawson; (4) John Does I through III, who acted as domiciliary foreign fiduciaries of the Estate of David Burgess, who was the solicitor for Ms. Dawson in the United Kingdom;[5] and (5) Hetherington & Company, Solicitors, a law partnership organized under the laws of the United Kingdom, at which Mr. Burgess worked.

Ms. Marshall asserts that the defendants acted in concert to assist Mr. Matthei in concealing his assets to defraud his creditors, of which Ms. Marshall is one. Ms. Marshall specifically asserts that Mr. Fenstermacher was hired by Ms. Dawson and Mr. Burgess to act as a "middle person" between Mr. Matthei and Ms. Dawson who would effectuate the transfer of Mr. Matthei's assets in the United Kingdom. Ms. Marshall further asserts that Mr. Matthei and the defendants participated in three schemes for the purpose of defrauding his creditors, including (1) the surreptitious removal of more than two million dollars Mr. Matthei received from his former employer, Merrill Lynch, in settlement of an employment law action, in violation of the matrimonial order entered with respect to his divorce from Ms. Kelley; (2) a "sham prenuptial" agreement between Mr. Matthei and Ms. Dawson, through which Mr. Matthei allegedly transferred ownership of all of his assets to Ms. Dawson; and (3) a liquidation of Mr. Matthei's apparently significant assets between 2000 and 2002, allegedly effected by Mr. Matthei, Ms. Dawson, Mr. Burgess and Hetherington.

According to Ms. Marshall, Mr. Fenstermacher's involvement in the scheme involved several transactions she refers to as the "Fenstermacher Transactions," which included: (1) the transfer of Mr. Matthei's shares of Lepanto to Ms. Dawson to facilitate liquidation of the London flat, which is alleged to have been worth more than $1 million; (2) concealment of the proceeds; and (3) creation of a "Consent Order" which originated in the United Kingdom

---

4. According to the Second Amended Complaint, Mr. Fenstermacher is an attorney licensed to practice law in Pennsylvania.

5. The Motion to Dismiss has been filed only by Mr. Fenstermacher and High Swartz. Mr. Burgess died since the time the case began, and his estate has been substituted as a party. Summonses associated with the Second Amended Complaint were issued on November 19, 2004 issued with respect to the Estate

of Mr. Burgess, Ms. Dawson, and Hetherington and Company. Of these defendants, the docket reflects that the Second Amended Complaint was served on Ms. Dawson on April 20, 2005. Additionally, upon the request of Ms. Marshall, the Clerk of Court entered a default against Ms. Dawson on May 18, 2005. Thus, as of this time, no service has been made on the Burgess Estate or Hetherington and Company.

between Mr. Matthei and Ms. Dawson to be filed in their divorce action. *Second Amended Complaint* at ¶ 53.

The "Fenstermacher Transactions" allegedly occurred between September 2000 and December 2001, beginning with a telephone call from Ms. Dawson to Mr. Fenstermacher seeking his assistance to sort out her finances with Mr. Matthei, who was then in federal custody in connection with charges of interstate transfers to avoid child support obligations. *Second Amended Complaint* at ¶ 56. This conversation was allegedly followed with various letters ultimately leading to contact between Mr. Fenstermacher and Mr. Matthei to facilitate the execution of paperwork that would effect the Fenstermacher Transactions. *Second Amended Complaint* at ¶¶ 57–83.

According to Ms. Marshall, the Consent Order was created to liquidate Mr. Matthei's assets and to "prove" to the court deciding the *capias* request that Mr. Matthei had conveyed all of his assets to Ms. Dawson. *Second Amended Complaint* at ¶ 74. Ms. Marshall asserts that as a result of the concerted action of the defendants, at least $1 million of Mr. Matthei's assets were transformed into untraceable cash, thereby defeating her ability to collect the judgment she is owed. *Second Amended Complaint* at ¶ 84.

The original complaint in this case was filed on March 3, 2004. An amended complaint as to Defendant Fenstermacher was filed on March 30, 2004. Upon an unopposed motion by Defendant Fenstermacher, the case was transferred from the District of New Jersey to the Eastern District of Pennsylvania on July 19, 2004. Upon a stipulation of the parties dated November 16, 2004, the Plaintiff filed a second amended complaint in this court on November 19, 2004.

The Second Amended Complaint is quite detailed[6] and includes the following counts: (1) Fraudulent Scheme against each of the Defendants; (2) Creditor Fraud against each of the Defendants; (3) Fraudulent Conveyance against Ms. Dawson; (4) Civil Conspiracy against each of the Defendants; (5) Fraud in the Furtherance of the Conspiracy against each of the Defendants; (6) Conversion against each of the Defendants; (7) Tortious Interference with Prospective Economic Advantage against each of the Defendants; (8) Intentional Tort or *Prima Facie* Tort against each of the Defendants; (9) Violation of Federal RICO "c" against each of the Defendants; (10) Violation of Federal RICO "d" (RICO Conspiracy) against each of the Defendants; (11) Violation of New Jersey RICO "c" against each of the Defendants; (12) Violation of New Jersey RICO "d" (RICO Conspiracy) against each of the Defendants; (13) *Respondeat Superior* liability with respect to High Swartz and Hetherington; and (14) Ratification/Equitable Estoppel with respect to High Swartz. Mr. Fenstermacher and High Swartz moved to dismiss the Second Amended Complaint on December 27, 2004.[7]

## DISCUSSION

### A. Standard of Review

When deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court may look only to the

---

**6.** The Second Amended Complaint includes 203 paragraphs.

**7.** Although the Defendants do not present arguments with respect to Counts XIII or XIV in the present motion, the Court notes that to the extent the claims against Mr. Fenstermacher are dismissed, there would be no basis for the liability alleged against High Swartz in these counts. Thus, the present motion will be treated as one seeking to dismiss the entire complaint against the moving defendants.

facts alleged in the complaint and its attachments. *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir.1994). The Court must accept as true all well-pleaded allegations in the complaint and view them in the light most favorable to the plaintiff. *Angelastro v. Prudential–Bache Sec., Inc.*, 764 F.2d 939, 944 (3d Cir.1985). A Rule 12(b)(6) motion will be granted only when it is certain that no relief could be granted under any set of facts that could be proved by the plaintiff. *Ransom v. Marrazzo*, 848 F.2d 398, 401 (3d Cir.1988).

### B. Choice of Law

■ At the outset, the parties disagree as to whether Pennsylvania or New Jersey law should apply to this case. The Defendants argue that pursuant to Pennsylvania's choice of law provisions, Pennsylvania law should apply. Ms. Marshall asserts that there is no actual conflict of laws and if the Court concludes that there is such a conflict, New Jersey law should apply.

■ When confronted with a conflict of law analysis in a diversity action, a district court must look to the conflicts regime of the forum state. *Echols v. Pelullo*, 377 F.3d 272 (3d Cir.2004) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 497, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)); *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187 (3d Cir.1991). In Pennsylvania, the choice of law rules are outlined in *Griffith v. United Air Lines*, 416 Pa. 1, 203 A.2d 796, 805 (1964). In *Griffith*, the Pennsylvania Supreme Court rejected the more structured "strict lex loci delicti" rule, which stated that in tort cases, the substantive rights of the parties would be governed by the law of the place where the wrong occurred. In its place, the court adopted "a more flexible rule which permits analysis of the policies and interests underlying the particular issue before the court." *Griffith*, 203 A.2d at 806. Over time, this new rule has been referred to as a "hybrid approach" that combines the approaches of the Restatement (Second) of Conflicts of Laws that considers contacts establishing significant relationships and the "interest analysis" and requires a "qualitative appraisal of the relevant States' policies with respect to the controversy." *Lacey*, 932 F.2d at 186.

■ Under Pennsylvania law, a conflict of law analysis begins with an "interest analysis," in which a court must consider the policies of each interested state to determine whether there exists a true conflict, a false conflict, or whether the claim is "unprovided for" under the law of either state. *Budget Rent–A–Car System, Inc. v. Chappell*, 407 F.3d 166, 170 (3d Cir.2005). A true conflict exists where the governmental interests of both jurisdictions would be impaired if their law were not applied. *Lacey*, 932 F.2d at 187 n. 15. If a true conflict exists, the test developed in *Griffith* and its progeny applies.[8]

■ Alternatively, a "false conflict" arises where the policies of the competing laws indicate that the application of one state's law would not further the policies of that state. *Cipolla v. Shaposka*, 439 Pa. 563, 267 A.2d 854, 855 (1970). In such a case, the court must apply the law of the state whose interests would be harmed if its law were not applied. *Lacey*, 932 F.2d at 187.

8. In making such a determination, the following factors are considered relevant: (1) the needs of interstate and international systems; (2) relevant policies of the forum; (3) relevant polices of other interested states and the relative interests of those states in the determination of the particular issue; (4) the protection of justified expectations; (5) basic policies underlying the particular field of law; (6) certainty, predictability and uniformity of the result; and (7) ease in the determination and application of the law to be applied. RESTATEMENT (SECOND) OF CONFLICTS OF LAW at § 6.

Finally, an "unprovided for" case is one in which no jurisdiction's interests would be impaired were its laws not applied. *Budget Rent–A–Car*, 407 F.3d at 170. In an "unprovided for" case, *lex loci delicti* continues to govern, and the law of the place where the wrong occurred will apply. *Id.*

The Defendants argue that Pennsylvania law should apply in this case because "New Jersey has no connection or relevance to the matter in this dispute," and that any interest the state may have in enforcing a judgment rendered in one of its courts "wanes over time especially in light of Plaintiff's lack of efforts to effectuate the judgment." The Defendants point out that the events relevant to this case, such as the alleged fraudulent communication between Mr. Fenstermacher and Mr. Matthei, as well as the execution of documents in furtherance of the alleged fraud took place while Mr. Matthei was incarcerated in the Eastern District of Pennsylvania.

In response, Ms. Marshall argues that New Jersey law should apply, in light of the State's strong interest in enforcing the rights of judgment creditors. To this end, Ms. Marshall urges the Court to adopt the recommendation of attorney Thomas H. Day, who authored an article in the *Business Lawyer* entitled "Solution for Conflict of Laws Governing Fraudulent Transfers: Apply the Law that was Enacted to Benefit the Creditors." 48 *Business Lawyer* 889 (1993). The basic goal of the article is to provide courts with guidance in choosing the "appropriate fraudulent transfer

law" to apply to a case where the circumstances surrounding the alleged fraud involve multi-state contacts. In working toward achieving this goal, Mr. Day presents the methods which various states apply in deciding which state's fraudulent transfer statute to apply, ultimately concluding that "[b]ecause fraudulent transfer laws are enacted to protect unsecured creditors, courts can avoid an arbitrary choice of law, maximize governmental interests of states with an interest in the case, and minimize the impairment of those interests by tailoring remedies and by choosing the laws of each of the states in which a creditor in this case is located." *Id.* at 913. Thus, Ms. Marshall argues that the law of New Jersey should apply in this case.

While Mr. Day's article provides an interesting theory with respect to the application of fraudulent transfer statutes, the Court observes that with the exception of the RICO claims, none of the claims in the present case were brought pursuant to the fraudulent transfer statute of either Pennsylvania or New Jersey.[9] As such, the Court finds it necessary to examine and assess each state's law with respect to the allegations, and conduct the conflict analysis as instructed by precedent in this district. Thus, in order to determine whether New Jersey or Pennsylvania law should apply in this case, the Court must examine the degree of conflict between the two states' laws.

### 1. Count I—Fraudulent Scheme

The Defendants argue that under either Pennsylvania or New Jersey law, there is no cause of action recognized as "fraudulent scheme." In addition, the Defendants

**9.** Although the Court notes that Defendants appear to believe Ms. Marshall's claim for civil conspiracy alleges a violation of the Uniform Fraudulent Transfer Act, *see Supplemental Memorandum of Law in Support of the Motion to Dismiss ... in Light of Banco Popular North America v. Gandi* at 7, a review of

the Second Amended Complaint reveals no citation to the fraudulent transfer statute of either Pennsylvania or New Jersey. Thus, all of the claims alleging fraudulent conveyances would certainly seem to be grounded in common law.

assert that where actions constituting a fraudulent scheme have been found to be actionable for a claim of common law fraud, only the party perpetrating the fraud, in this case Mr. Matthei, could be held liable. In response, Ms. Marshall asserts that courts in both states have acknowledged the claim.

The Court agrees that there does not appear to be a particular claim entitled "fraudulent scheme" under either Pennsylvania or New Jersey law. One Pennsylvania court has held that behaviors amounting to participation in a fraudulent scheme may be actionable as common law fraud or deceit, *see Fry v. Schumaker,* 83 F.Supp. 476, 477 (E.D.Pa.1947) (finding that stock brokers could be held liable for fraud with respect to solicitation letter to purchase plaintiffs' stock absent misleading statement of fact as long as brokers knew they were "rendering service essential to or participating in a scheme of fraud"). However, the conduct at issue in that case was related to an actionable fraud claim. *Id.* (defendant brokers part of alleged scheme to deceive stock holders). *See also Mancini v. Morrow,* 312 Pa.Super. 192, 458 A.2d 580, 585 (1983) (noting that under Pennsylvania law, fraud is "anything calculated to deceive, whether by single act, or a combination, or by suppression of truth, or a suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, or word of mouth, or look or gesture").

Likewise, the New Jersey Supreme Court has also recently held that an alleged fraudulent scheme, absent allegations of all of the elements of common law fraud (including misrepresentation, knowledge of the falsity of the misrepresentation, intent that a party rely on the misrepresentation and reasonable reliance) could not amount to an actionable fraud claim. *See Banco Popular North America v. Gandi,* 184 N.J. 161, 171, 876 A.2d 253, 259 (2005).

Upon review of the elements required under each state's law, the Court concludes that there is no conflict between the laws of Pennsylvania and New Jersey with respect to the tort of common law fraud. Thus, the law with respect to this claim is "unprovided for," and the Court will apply *lex loci delicti* to determine the applicable law.

According to both parties, the allegedly tortious acts (i.e., facilitating the transfer of assets to frustrate Ms. Marshall's execution) of Mr. Fenstermacher occurred while Mr. Matthei was incarcerated in Pennsylvania.[10] Thus, Pennsylvania is the site of the alleged tortious act, and Pennsylvania law applies.[11]

To state a claim for fraud under Pennsylvania law, a plaintiff must assert (1) a false representation of an existing factor; (2) materiality, if the misrepresentation is innocently made;[12] (3) scienter,

---

**10.** Ms. Marshall alleges, and the Defendants do not deny, that at the time Ms. Dawson first contacted Mr. Fenstermacher seeking his services, Mr. Matthei was incarcerated federal custody in connection with charges of interstate transfers to avoid child support obligations. *Second Amended Complaint* at ¶ 56. At oral argument, counsel for Mr. Fenstermacher asserted, and counsel for Ms. Marshall did not disagree, that Mr. Matthei was incarcerated at the Federal Detention Center located in Philadelphia at this time. *Oral Arg. Trans.* at 5–7.

**11.** In addition, the Court notes that Mr. Fenstermacher is an attorney who is licensed in Pennsylvania, thereby amplifying the interest that Pennsylvania has in this case, thereby further supporting the application of Pennsylvania law.

**12.** If a misrepresentation is knowingly made or involves a non-privileged failure to disclose, materiality is not required to be established.

which may be either actual knowledge of a truth or falsity of representation, reckless ignorance of the falsity of the matter, or mere false information where a duty to know is imposed on a person by reason of special circumstances; (4) reliance, which must be justifiable, so that common prudence or diligence could not have ascertained the truth; and (5) damage to the person relying thereon. *Mancini v. Morrow*, 312 Pa.Super. 192, 458 A.2d 580, 585 (1983). Thus, Ms. Marshall would have to allege that by Mr. Fenstermacher effectuating the backdating of documents to transfer Mr. Matthei's assets so as to avoid execution by Ms. Marshall and Mr. Matthei's other creditors, Mr. Fenstermacher (and, by the doctrines of *respondeat superior* and ratification, High Swartz) knowingly made a false representation upon which Ms. Marshall relied to her detriment.

The allegations in the Second Amended Complaint state that Mr. Fenstermacher participated in a scheme that encompassed several intentional misrepresentations, including (1) the fraudulent misdating of the Lepanto documents, and (2) the submission of a "Station of Information" which represented to a United Kingdom court that Mr. Matthei had "no assets". *Seconded Amended Complaint* at ¶ 104. The Second Amended Complaint further alleges that these actions were precipitated by the New Jersey Superior Court's decision affirming the *capias* writ, that Mr. Fenstermacher provided legal services with the knowledge that Mr. Matthei was effecting fraudulent transfers through the use of "fraudulent devices," and that the actions went "beyond the scope of honorable employment of an attorney" to further the "illicit interests" of Mr. Matthei and co-defendant Emma Dawson. *Second Amended Complaint* at ¶¶ 51, 102–03. Finally, the Second Amended Complaint sets forth specific examples of actions that the Defendants are alleged to have taken, and

states that each action "constitutes a *sufficient misrepresentation or equivalent* thereof under the law to constitute defendants' actions *a fraud.*" *Second Amended Complaint* at ¶¶ 103, 105 (emphasis added).

Although the Second Amended Complaint sets forth Ms. Marshall's allegations in great detail, the Court does not agree that quantity can make up for quality in this regard, and the Court does not believe the Second Amended Complaint sufficiently alleges a claim for common law fraud. The Court acknowledges that Ms. Marshall alleges the existence of not one, but several, misrepresentations. However, upon closer examination, the Second Amended Complaint does not allege that the purported misrepresentations made by Mr. Fenstermacher were made for the purpose of gaining Ms. Marshall's reliance thereon. Rather, all of the alleged intentional and inferential misrepresentations were made *after* Ms. Marshall provided Mr. Matthei with legal services, and she does not assert that she acted in reliance on any of the allegedly fraudulent documents set forth within the Second Amended Complaint. Thus, the Second Amended Complaint does not allege that Ms. Marshall's alleged injury was caused by her reliance upon such a misrepresentation effected by Mr. Fenstermacher. In short, the Court concludes that Ms. Marshall's claim for "fraudulent scheme" does not include sufficient allegations to support a claim for common law fraud. Thus, this count of the Second Amended Complaint will be dismissed.

### 2. Count II—Creditor Fraud

■ The Defendants next argue that because neither Pennsylvania nor New Jersey recognizes the tort of creditor fraud, the second count of the Second Amended Complaint must be dismissed.

A review of Pennsylvania case law, including cases cited by each of the parties,[13] reveals little support the notion that "creditor fraud" is recognized as a claim. However, the behavior alleged by Ms. Marshall in this case may be actionable as a claim for civil conspiracy. *See, e.g., Rumbaugh v. Beck*, 411 Pa.Super. 220, 601 A.2d 319 (1991) (finding action for diversion of profits from corporation to be action sounding in civil conspiracy);[14] *Cochran v. Arnold*, 58 Pa. 399 (Pa.1868) (concluding that a false certification with respect to the existence of a corporation would constitute a fraud upon creditors for which the "law furnishes a remedy"). Thus, the Court anticipates that Pennsylvania courts would allow a cause of action civil conspiracy[15] to address the circumstances alleged in this case, but would not acknowledge a specific claim for creditor fraud.

The New Jersey Supreme Court likewise has declined to adopt the claim of creditor fraud. In *Banco Popular North America v. Gandi*, 184 N.J. 161, 876 A.2d 253 (2005), an attorney allegedly advised his client who had personally guaranteed several business loans to transfer his assets to the client's wife in order to avoid allowing the assets to be attached by the creditor bank. The bank filed suit not only against the debtor, but also the debtor's attorney, alleging that the attorney was liable for various claims, including creditor fraud and civil conspiracy.[16] *Banco Popular*, 184 N.J. at 166, 876 A.2d at 256. In defense, the attorney argued that creditor fraud was not a recognized tort under New Jersey law.

The *Banco Popular* court agreed with the attorney defendant. After noting that in New Jersey misrepresentation and reliance were "hallmark" elements, the court held that a claim for "creditor fraud" which excused the absence of these elements could not stand. *Banco Popular*, 184 N.J. at 171, 876 A.2d at 259 ("an amorphous creditor fraud claim that requires plaintiffs to prove neither reliance nor misrepresentation does not exist in New Jersey"). However, the *Banco Popular* court also observed that the alleged conduct of the attorney defendant was not without recourse, as such claims were "re-

13. In support of the argument that Pennsylvania does not recognize a claim for creditor fraud, Defendants cite *Corporate Aviation Concepts, Inc. v. Multi–Service Aviation Corp.*, 2004 WL 1900001, 2004 U.S. Dist. LEXIS 17154 (E.D.Pa. Aug. 25, 2004). In response, Ms. Marshall argues that the claim was recognized in *Rumbaugh v. Beck*, 411 Pa.Super. 220, 601 A.2d 319 (1991), which is discussed *infra* at note 14.

14. Although Ms. Marshall asserts that *Rumbaugh* supports the existence of a claim for creditor fraud in Pennsylvania, the Court concludes that that case does not so clearly state that the tort of "creditor fraud" is actionable under Pennsylvania law. In *Rumbaugh*, the plaintiff was a shareholder who brought an action to recover profits from a corporation which he asserted were diverted as a result of the conspiratorial conversion of assets to avoid execution on a judgment. *Rumbaugh*, 601 A.2d at 321–22. In finding that there was sufficient evidence presented to support

the existence of a conspiracy, the court noted that a claim for such behavior was actionable. *Id.* at 327. The court, however, referred to the action as one of "civil conspiracy," and not "creditor fraud." *Id.* at 325.

15. The elements needed to assert a claim for civil conspiracy are discussed *infra*, in the section of this Memorandum analyzing whether a conflict of law exists with respect to civil conspiracy.

16. The *Banco Popular* plaintiff also asserted claims for common law fraud, negligence and ethical violations against the attorney. The common law fraud and negligence claims were dismissed because there had been no allegation that the attorney defendant had made a misrepresentation to the bank. *Banco Popular*, 268 N.J.Super. at 169, 633 A.2d at 258. The alleged ethical violations are discussed *infra* with respect to the civil conspiracy allegation.

mediable by way of other recognized causes of action," such as a claim under the state's Uniform Fraudulent Transfer Act[17] or a common law claim for civil conspiracy. Thus, the plaintiff's claim for creditor fraud was dismissed.

Because the tort of creditor fraud is not recognized by either Pennsylvania or New Jersey courts, absent an allegation of misrepresentation and reliance, Ms. Marshall has no basis upon which to assert such a claim here. As discussed above, even with the assumption that all allegations in the Second Amended Complaint are true, there are insufficient allegations of misrepresentation and reliance to support a claim for fraud. Thus, Ms. Marshall's claim for creditor fraud would not be recognized under the law of either New Jersey or Pennsylvania, and it will therefore be dismissed.

### 3. Count IV—Civil Conspiracy

■ To state a claim for civil conspiracy under Pennsylvania law, a plaintiff must allege (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage. *General Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir.2003).

■ Under New Jersey law, a plaintiff asserting a claim for civil conspiracy must demonstrate that a combination of two or more persons acted in concert to commit an unlawful act, or to commit a lawful act by unlawful means, "a principal element of which is to inflict a wrong against or injury upon another, and an overt act that results in damage." *Morgan v. Union Cty. Bd. of Chosen Freeholders*, 268 N.J.Super. 337, 633 A.2d 985, (1993), *cert. denied*, 135 N.J. 468, 640 A.2d 850 (1994). Liability may be imposed on a party as long as the party understands "the general objectives of the scheme, accept(s) them, and agree(s), either explicitly or implicitly" to act in furtherance of the scheme. *Banco Popular*, 184 N.J. at 177, 876 A.2d at 262–63.

■ There is no conflict between the laws of Pennsylvania and New Jersey with respect to the claim of civil conspiracy. Because there is no conflict between Pennsylvania and New Jersey law with respect to this count, the claim is "unprovided for," thereby requiring that the Court apply the *lex loci delicti* test to determine the applicable law. As the Court has already noted, the alleged tortious actions taken by Mr. Fenstermacher occurred in Pennsylvania, and Pennsylvania law therefore applies to this count of the Second Amended Complaint.

■ The Defendants first argue that Ms. Marshall's claim for civil conspiracy must be dismissed because none of the other allegations in the Second Amended Complaint sufficiently support an underlying claim and, without such a claim, no claim for conspiracy may lie.[18] In this

**17.** New Jersey's Uniform Fraudulent Transfer Act provides that "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation ... with actual intent to hinder, delay, or defraud any creditor of the debtor." N.J.S.A. § 25:2–25. Although the Defendants here, in one of their responsive submissions with respect to the present Motion, refer to Ms. Marshall's claim as a "UFTA" claim, a careful review of the Second Amended Complaint reveals no such statutory allegation.

**18.** In support of this assertion, Defendants cite to *Haynes v. Metropolitan Life Ins. Co.*, 94 Fed.Appx. 956, 959, 2004 WL 835838 (3d Cir.2004), in which the court stated that "a conspiracy claim must fail if the underlying act itself would not support an action." Although it is logical that a plaintiff must allege a cause of action that a defendant conspired

regard, Defendants ignore some complicated and intricate but important facts and circumstances associated with this case that are included in the allegations of the Second Amended Complaint, the primary of which is the fact that Mr. Matthei was found by a court to have conveyed his property with the intent to defraud his creditors. *See Marshall v. Matthei,* 327 N.J.Super. 512, 744 A.2d 209, 215 (2000). By setting forth in great detail in the first 96 paragraphs of the Second Amended Complaint the facts allegedly underlying the fraudulent conveyances, Ms. Marshall has alleged that the Defendants in this suit conspired with Mr. Matthei for the purpose of effecting the illegal conveyances. Defendants' argument that there was no underlying offense to support a claim for civil conspiracy therefore fails.

 Defendants alternatively argue that as Mr. Matthei's attorney, Mr. Fenstermacher could not have conspired with his client because the "intracorporate conspiracy doctrine" applied under Pennsylvania law precludes a plaintiff from asserting that an entity conspired with a person acting as the entity's agent. Pennsylvania courts do subscribe to the intracorporate conspiracy doctrine, under which an employee acting within the scope of his employment cannot be alleged to have conspired with the employer. *See General Refractories Co. v. Fireman's Fund Ins. Co.,* 337 F.3d 297 (3d Cir.2003). The Court of Appeals for the Third Circuit has held that absent actions taken for personal purposes outside the scope of the attorney's representation of the client, this doctrine should be enforced in the attorney-client context. *See Heffernan v. Hunter,* 189 F.3d 405, 413 (3d Cir.1999) (finding no liability for civil conspiracy against attorney who allegedly assisted client in intimidating witness testifying in insider trading investigation by filing frivolous lawsuit). However, if an attorney counsels a client to act in a manner that violates the rights of a third party, the attorney may be liable to the extent that a non-lawyer would be in the same situation. RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS §§ 56, 94;[19] *see also McElhanon v. Hing,* 151 Ariz. 386, 728 P.2d 256, 264 (1985), *aff'd. in part, vacated on other grounds,* 151 Ariz. 403, 728 P.2d 273, 283 (1986) (finding that acts of attorney on behalf of client were not privileged and did not provide immunity from suit because privilege did not apply to "intentional acts of furthering and participating in a fraudulent conveyance").

to commit, the Court notes that the *Haynes* court was interpreting Alabama, and not Pennsylvania law, and designated its opinion therein a non-precedential one.

19. The Restatement (Third) of the Law Governing Lawyers provides that "[a] lawyer who counsels or assists a client to engage in conduct that violates the rights of a third person is subject to liability to the third person" to the extent that a non-lawyer would be subject to liability in similar circumstances. RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS at § 56. Although it does not appear that the Pennsylvania Supreme Court has formally adopted this particular section of the Restatement, in a concurring opinion in a recent case, *Reutzel v. Douglas,* 870 A.2d 787, 793–794 (Pa.2005), Chief Justice Cappy embraced and recommended the adoption of Section 27 of the Restatement regarding the doctrine of apparent authority in the context of settlement authority. Some lower courts within the Commonwealth have also relied upon other sections of the Restatement. *See, e.g., Quantitative Fin'l Strategies, Inc. v. Morgan Lewis & Bockius,* 2002 WL 434380 (Pa. Comm.Pl. March 12, 2002) (noting that Section 46 of the Restatement recognizes an attorney's implicit right to maintain copies of client files); *Agster v. Barmada,* 1999 WL 1577979 (Pa.Comm.Pl. Oct. 21, 1999) (relying on Section 25 of the Restatement in discussing attorney client privilege applicable to co-clients). Thus, it is reasonable for the Court to look to the Restatement for guidance on this matter.

The Defendants assert that because Ms. Marshall does not allege that Mr. Fenstermacher's conduct was outside the scope of his representation of Mr. Matthei, and was, rather, for personal purposes, no conspiracy between Mr. Fenstermacher and Mr. Matthei can be alleged. Although this argument initially appears sound, the Court again notes that the allegations are more complicated than the Defendants would construe them. For example, the conspiracy alleged in this action encompassed individuals other than Mr. Fenstermacher, thereby expanding the alleged conspiratorial activities beyond the attorney-client relationship. Ms. Marshall alleges that Mr. Fenstermacher, Ms. Dawson, and Mr. Burgess, along with their respective law firm employers, "shared a common unlawful purpose of effectuating the concealment of Matthei's assets and interference with creditors' rights." *Second Amended Complaint* at ¶ 125. Ms. Marshall also alleges that the actions of Mr. Burgess, Mr. Fenstermacher and their respective law firms went "beyond the scope of honorable employment of an attorney, and were not performed for any justifiable and proper interest of their 'clients,' but were instead dedicated to furthering the *unlawful* interests of Matthei and Dawson." *Second Amended Complaint* at ¶ 124. Finally, Ms. Marshall alleges that she was and continues to be damaged by these acts, as she has been unable to collect her judgment from Mr. Matthei. *Second Amended Complaint* at ¶ 126. Thus, Ms. Marshall does allege that Mr. Fenstermacher assisted Mr. Matthei in furthering and participating in the allegedly fraudulent conveyance of Mr. Matthei's assets. Because the allegations in the Second Amended Complaint extend beyond asserting a simple conspiracy between Mr. Fenstermacher and his client, the Court concludes that the intracorporate conspiracy doctrine does not apply in this case. Moreover, because the allegations further assert that Mr. Fenstermacher's representation of Mr. Matthei assisted with furthering and participating a fraudulent conveyance, the Court concludes that the actions alleged fall outside the scope of legitimate representation of Mr. Matthei. Therefore, this count of the Second Amended Complaint will not be dismissed.[20]

### 4. Count V—Fraud in Furtherance of Conspiracy

 The Defendants argue that Ms. Marshall's claim for fraud in furtherance of conspiracy must be dismissed because this tort is not recognized under either Pennsylvania or New Jersey law. The Defendants further argue that even if proven true, the actions and representations of Mr. Matthei set forth in this count do not directly implicate either Mr. Fenstermacher or High Swartz and, therefore, must be dismissed.

In her response and supplemental memoranda, Ms. Marshall does not deny these defense assertions. Rather, Ms. Marshall states that "although set forth as a sepa-

---

**20.** In one of several submissions of supplemental authority, Ms. Marshall called the Court's attention to *Federal Trade Comm'n v. Assail, Inc.*, 410 F.3d 256, 263 (5th Cir.2005), in which the court held that when an attorney is put on notice that his fee may derive from a pool of frozen assets, the attorney has "a duty to inquire as to the source of his fee". After acknowledging that *Assail* addressed the disgorgement of attorney fees and not an attorney's civil liability, counsel for Ms. Marshall urges that the Court apply this duty to inquire in this case by concluding that Mr. Fenstermacher had a duty to investigate whether the transfer of Mr. Matthei's assets would have violated the judgment held by Ms. Marshall. Because the Court concludes that this claim will not be dismissed, consideration of an application of such a duty at this juncture of the litigation is not necessary and the Court declines the invitation to add to a lawyer's already weighty burdens.

rate count of the Second Amended Complaint, Matthei's false representation to the plaintiff and the Court in May 2001 were additional overt acts in furtherance of the broader conspiracy to engage in the Fenstermacher Transactions and complete the transfer of Matthei's assets to Dawson." Thus, Ms. Marshall argues that because the Defendants were co-conspirators, they should be held liable for the overt acts committed by other co-conspirators in furtherance of the conspiracy.

The Court notes that neither the Defendants nor Ms. Marshall have cited to any case in which "fraud in furtherance of conspiracy" was asserted as a separate count of a complaint. Moreover, after conducting a review of case law interpreting the laws of New Jersey and Pennsylvania, the Court concludes that while actions taken by a defendant classified as fraudulent acts in furtherance of a conspiracy may support allegations of fraud, it does not appear that "fraud in furtherance of a conspiracy" exists as a freestanding claim under the law of either jurisdiction. *See Com. v. Grazier*, 481 Pa. 622, 393 A.2d 335, 340 (1978) (noting that mailing by only one of many schemers "in furtherance of the fraud" would attach liability under mail fraud statute); *United Jersey Bank v. Kensey*, 306 N.J.Super. 540, 704 A.2d 38, 46 (1997) (observing that a bank having actual knowledge of fraud being perpetrated on a customer could be held liable for resulting loss if bank entered into transaction with customer "in furtherance of the fraud").

When the allegations in this count of the Second Amended Complaint [21] are considered in conjunction with the claim for civil conspiracy set forth in Count IV of the Second Amended Complaint, it is clear that the same cause of action is stated. Thus, Ms. Marshall's claim for fraud in furtherance of the conspiracy shall be merged with her claim for civil conspiracy, and the fifth count of the Second Amended Complaint will be dismissed.

### 5. Count VI—Conversion

 Under Pennsylvania law, a plaintiff asserting a claim of conversion must allege (1) the deprivation of a right in, or use or possession of, property (2) with or without the owner's consent, and (3) without lawful justification. *Universal Premium Acceptance Corp. v. York Bank and Trust Co.*, 69 F.3d 695, 705 (3d Cir. 1995). Under New Jersey law, conversion is defined as the wrongful exercise of dominion and control over the property of another in a manner inconsistent with the other person's rights in that property. *Communications Programming, Inc. v. Summit Manufacturing, Inc.*, No. 98–253, 1998 WL 329265, at *5 (D.N.J. June 16, 1998). Under the law of either state, the party asserting a claim for conversion must have had "an immediate right of possession of the property at the time it was allegedly converted." *Communications Programming, Inc.*, No. 98–253, 1998 WL 329265 (D.N.J. June 16, 1998) (examining both Pennsylvania and New Jersey law). Failure to pay a debt is not conversion. *Bernhardt v. Needleman*, 705 A.2d 875, 877 (Pa.Super.1997).

 There is no conflict between Pennsylvania and New Jersey law with respect to the tort of conversion; the cause of action includes the same elements in both states. *See Communications Program-*

---

**21.** The allegations in the Second Amended Complaint state that Mr. Matthei, "in furtherance of the conspiracy," misled the New Jersey court adjudicating Ms. Marshall's request for the *capias* writ and, that as a result of this behavior, the remaining defendants "were able to complete the Fenstermacher transac-tions and liquidate the Mayfair Flat." *Second Amended Complaint* at ¶¶ 128–29. Ms. Marshall further alleges that all of the defendants are liable "for the harm caused by this branch of the Conspiracy." *Second Amended Complaint* at ¶ 130.

*ming, Inc.,* 1998 WL 329265, at *5 (concluding no actual conflict between Pennsylvania and New Jersey laws of conversion). Thus, the law relating to this count of the Second Amended Complaint is classified as "unprovided for," and the Court again will apply *lex loci delicti* to determine the applicable law. As discussed *supra,* because the allegedly tortious acts with respect to this claim occurred while Mr. Matthei was incarcerated in Pennsylvania, the Court repeats its conclusion that because Pennsylvania is the site of the alleged tortious act, Pennsylvania law will apply to this claim.

■■■ Defendants argue that Ms. Marshall's claim for conversion must be dismissed because the allegations in the Second Amended Complaint do not sufficiently support such a claim. Defendants specifically argue that because Ms. Marshall alleges that she merely was owed a debt and not that she had actual property rights in the assets that were allegedly converted, she may not proceed on a conversion theory.

In turn, Ms. Marshall, after conceding that status as a creditor is insufficient to support a claim for conversion, argues that the *capias* writ confers upon Ms. Marshall a sufficient right to possess the shares of Lepanto and/or Mr. Matthei's London flat. Under New Jersey law,[22] a *capias ad sa-*

*tisfaciendum* writ is a "body execution enabling a judgment creditor in certain types of cases to cause the judgment debtor to be arrested until the debtor either pays the judgment or is discharged as insolvent." *Marshall v. Matthei,* 327 N.J.Super. 512, 744 A.2d 209, 217 (2000). As the Defendants note, the writ is intended to be "a contempt-like device" against a defendant who is able, but refuses, to pay a judgment. *Id.* It does not appear that the purpose of a *capias* writ is to confer a property interest, but rather it is issued to "persuade" a defendant debtor to comply with a court's order of judgment. Thus, because Ms. Marshall has not established that she has property rights in assets which Mr. Fenstermacher had a fiduciary duty to protect,[23] the claim for conversion will be dismissed.

### 6. Count VII—Tortious Interference with Prospective Economic Advantage

■■■ Under Pennsylvania law, a plaintiff asserting a claim for tortious interference with a prospective economic advantage must demonstrate that (1) a contractual or prospective contractual relationship existed between plaintiff and a third party; (2) a defendant took purposeful action intended to harm that relationship; (3) that no privilege or justification applies to the harmful action;[24] and

---

**22.** The *capias* writ was issued pursuant to the law of New Jersey, and the Court will therefore consider the purpose underlying the issuance of such a writ with respect to New Jersey law.

**23.** In support of her argument, Ms. Marshall cites to *City of Philadelphia v. Penn Plastering Corp.,* 434 Pa. 122, 253 A.2d 247, 249 (1969), in which the court found that the controlling officer of a corporation that collected payroll taxes as an agent for the City of Philadelphia could be subject to a claim for conversion where the officer allegedly participated in the corporation's conversion and use of the taxes. This case is inapposite to the present circum-

stances because there is no suggestion that Mr. Fenstermacher acted as a fiduciary with respect to Mr. Matthei's assets, nor is there any credible allegation that Ms. Marshall had any fiduciary relationship with Mr. Fenstermacher.

**24.** A defendant's actions will be considered privileged if the conduct in question (1) concerns the subject of competition between the parties: (2) does not use wrongful means; (3) does not create an unlawful restraint on trade; and (4) has at least a partial goal of advancing an interest in competing with the plaintiff. *Fin'l Services, Inc. v. S.G. Cowen Securities Corp.,* 206 F.Supp.2d 702, 721

(4) damages resulted from the defendant's conduct. *Intervest Fin'l Services, Inc. v. S.G. Cowen Securities Corp.*, 206 F.Supp.2d 702, 721 (E.D.Pa.2002), *aff'd. sub. nom. InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144 (3d Cir.2003); *see also Crivelli v. General Motors Corp.*, 215 F.3d 386, 394 (3d Cir.2000). In addition, Pennsylvania law requires that improper conduct by the alleged tortfeasor be demonstrated. *Crivelli*, 215 F.3d at 394. Factors to be considered in assessing a defendant's behavior include (1) the type of conduct; (2) the motive underlying that conduct; (3) the interest with which that action interferes and the interests advanced by it; (4) societal interests in either protecting or condemning the conduct; (5) the nexus between the conduct and the interference; and (6) the nature of the relationship between the parties. *Intervest Fin'l Services*, 206 F.Supp.2d 702, 721 n. 20 (E.D.Pa.2002).

■■■■ To establish such a claim under New Jersey law, a plaintiff must demonstrate that (1) the plaintiff had some reasonable expectation of economic advantage; (2) a defendant's actions were malicious in the sense that the harm was inflicted intentionally and without justification or excuse; (3) the interference caused the loss of the prospective gain or there was a reasonable probability that the plaintiff would have obtained the anticipated economic benefit; and (4) the injury caused the plaintiff damage. *Mandel v. UBS/Painewebber, Inc.*, 373 N.J.Super. 55, 860 A.2d 945, 959 (2004). Under New Jersey law, no actual contract need exist to pursue a claim for tortious interference; the law "protects both contracts and prospective business relationships" from interference by tortfeasors. *Id.*

At oral argument, defense counsel argued that because Pennsylvania law requires that a contract exist or, at a minimum, be contemplated, while New Jersey law does not have this requirement, the states' laws conflict. *Oral Arg. Trans.* at 36:2–8. Defendants specifically argued that because the contract between Ms. Marshall and Mr. Matthei terminated at the time the judgment was rendered in Ms. Marshall's favor, there was no contract in existence with which Mr. Fenstermacher could have interfered. In turn, Ms. Marshall argues that this distinction is not relevant to the present case because, by virtue of the fact that Mr. Matthei has still not paid Ms. Marshall, the contract continues to remain unperformed on Mr. Matthei's part. Thus, Ms. Marshall argues that the apparent conflict presents a distinction without a difference.

■■■■ The Court concludes that it need not resolve either the conflict of law or the conflicting arguments of the parties because the allegations in the Second Amended Complaint fail to state a claim under either state's law for other reasons. Under either Pennsylvania or New Jersey law, a plaintiff asserting a claim for tortious interference with contractual relations must allege an expectation, either by contract or otherwise, for economic gain. In this case, Ms. Marshall does not allege that Mr. Fenstermacher encouraged Mr. Matthei to breach the contract by not paying for her services. Rather, the allegations state that Mr. Fenstermacher worked in concert with Mr. Matthei, Ms. Dawson, and the other Defendants to transfer Mr. Matthei's assets after judgment in Ms. Marshall's favor had been rendered and *after* the *capias* writ was issued. Because Mr. Fenstermacher is

(E.D.Pa.2002), *aff'd. sub. nom. InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144 (3d Cir. 2003).

not alleged to have interfered with the contract between Ms. Marshall and Mr. Matthei, but rather is alleged to have conspired to ensure that Ms. Marshall (or any other creditor) could not collect on her judgment, when looked at critically the Second Amended Complaint does not allege that Mr. Fenstermacher interfered with the contractual relationship between Ms. Marshall and Mr. Matthei. This count of the Second Amended Complaint will be dismissed.

### 7. Count VIII—Intentional Tort or *Prima Facie* Tort

■ The cause of action of "intentional" or *"prima facie"* tort appears in Section 870 of the Restatement (Second) of Torts, which provides that "[o]ne who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances." Restatement (Second) of Torts § 870. Section 870 also states that such liability "may be imposed although the actor's conduct does not come within a traditional category of tort liability." *Id.* Thus, a claim for intentional tort, if recognized, would likely be appropriate where there is no other category of tort liability within which a plaintiff's claim would fit.

■ The Pennsylvania Supreme Court has not adopted Section 870 and has not yet recognized a claim for either an intentional or a *prima facie* tort.[25] *See D'Errico v. DeFazio*, 763 A.2d 424, 433 (Pa.Super.2000) ("Pennsylvania has not yet adopted intentional or *prima facie* tort").

While at least one federal court interpreting Pennsylvania law has allowed for such a claim, *see, e.g., L&M Beverage Co. v. Guinness Import Co.*, No. 94–4492, 1995 WL 771113 (E.D.Pa. Dec. 29, 1995), (acknowledging that Pennsylvania has not recognized a claim for *prima facie* tort but allowing a claim for intentional tort because alleged conduct met definition provided in Section 870), others have declined to do so. *See, e.g., Charles Shaid of Pa, Inc. v. George Hyman Constr. Co.*, 947 F.Supp. 844, 847–56 (E.D.Pa.1996) (discussing historical background of intentional tort and predicting that Pennsylvania Supreme Court would not allow for such a claim); *Hanenberg v. Borough of Bath*, No. 94–1929, 1994 WL 388279 (E.D.Pa. July 27, 1994). For example, in *Hanenberg*, the court declined to recognize intentional tort as a cause of action where various other counts in the plaintiff's complaint provided "sufficient remedies" to redress any harm the plaintiff had suffered. *Hanenberg*, 1994 WL 388279, at *5. Based on a review of these cases, this Court also concludes that Pennsylvania does not recognize a cause of action for intentional or *prima facie* tort where, as here, other remedies are available to redress harm alleged.

In New Jersey, the law with respect to claims for intentional tort is slightly more settled. In *Taylor v. Metzger*, 152 N.J. 490, 706 A.2d 685, 701 (1998), the New Jersey Supreme Court acknowledged that the existence of a *prima facie* tort was recognized by one appellate division court

---

**25.** A *prima facie* tort is defined as "the intentional infliction of harm, resulting in damage, without excuse or justification, by an act which would otherwise be lawful." *L & M Beverage Co. v. Guiness Import Co.*, No. 94–4492, 1995 WL 771113, at *5 (E.D.Pa. Dec. 29, 1995) (citing Black's Law Dictionary). Alternatively, an intentional tort may be claimed when a party intentionally causes injury to another, if his conduct is "generally culpable and not justifiable under the circumstances." *Id.* The *L & M Beverage Co.* court went on to note that pursuant to the Restatement (Second) of Torts, liability may be imposed when an actor's conduct "does not come within a traditional category of tort liability." *Id.*

in the state. However, the *Taylor* court also noted that claims for intentional tort were typically reserved for harms that "fall within the gaps of the law," and declined to allow the claim in the case before it because the plaintiff's other claims encompassed the conduct under which the plaintiff asserted his intentional tort claim. *Id.* at 701.

After considering the law of both states with respect to a claim of intentional tort, this Court concludes that there is no conflict between the law of Pennsylvania and New Jersey. Under the law of either state, whether or not such a claim would be acknowledged in some circumstances lest a plaintiff be left without recourse at all, the circumstances of this case dictate that Ms. Marshall's claim for intentional or *prima facie* tort be dismissed. As is demonstrated by the Second Amended Complaint, which includes 14 counts outlined in 203 paragraphs, Ms. Marshall has alleged several other legal theories by which the harms allegedly committed by the Defendants may be redressed. As such, the Court concludes that there are no "gaps in the law" present in this case which would eliminate all other potential remedies for Ms. Marshall. Therefore, the Court declines to extend the law of either Pennsylvania or New Jersey to include a claim for intentional or *prima facie* tort in this case, and this count of the Second Amended Complaint will be dismissed.

### 8. Counts Nine and Ten—Federal RICO Violations

The ninth and tenth counts of the Second Amended Complaint allege violations of Sections 1962(c) and 1962(d) of the federal Racketeer Influenced and Corrupt Organizations ("RICO") Act. Section 1962(c) of RICO states that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate,

directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). In turn, Section 1962(d) states that "it shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section." 18 U.S.C. § 1962(d).

### a. Count IX—Violation of Section 1962(c)

 To establish a Section 1962(c) violation, a plaintiff must allege (1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated, either directly or indirectly, in the conduct or the affairs of the enterprise; and (4) that he or she participated through a pattern of racketeering activity. *United States v. Urban*, 404 F.3d 754, 769 (3d Cir.2005).

Defendants first argue that these claims must be dismissed because "[p]laintiff has pled no facts which, even if proven true, shows [*sic*] that the enterprise had an existence beyond which is necessary merely to commit each of the acts charged as predicate racketeering offenses." *Memorandum in Support of Motion to Dismiss* at 24. After reviewing the allegations in the Second Amended Complaint, the Court disagrees.

 A RICO enterprise is "an entity made up of a group of persons associated together for the common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). To establish the existence of an "enterprise," a plaintiff must allege that (1) the enterprise is an ongoing organization with some sort of framework or superstructure for making or carrying out decisions; (2) the members of the enterprise function as a

continuing unit with established duties; and (3) the enterprise must be separate and apart from the pattern of activity in which it engages. *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 789–90 (3d Cir.1984). In the context of a motion to dismiss, a "bare allegation" that a particular set of defendants constituted an enterprise is sufficient to allow a claim to proceed. *Id.* at 790.

In the ninth count of the Second Amended Complaint, Ms. Marshall specifically alleges that the Defendants, either collectively or through the activities of Mr. Matthei and Ms. Dawson or the structure of Lepanto, constitute "an enterprise ... which is engaged in activities which affect interstate or foreign commerce." *Second Amended Complaint* at

¶ 152. Although in the Court's estimation this charge presents the barest of allegations,[26] the Court must assume the statements as alleged to be true and necessarily concludes that the first prong of the test to establish a Section 1962(c) RICO claim has been met.[27]

Defendants next argue that Ms. Marshall has failed to plead any facts which, if proven true, show that either Mr. Fenstermacher or High Swartz took any independent action in furtherance of the alleged activity, or that either of these Defendants directed any of the alleged enterprise's affairs. *Id.* at 24–25. Again, the Court disagrees. Under RICO, at least two predicate acts of racketeering are required to establish a pattern of racketeering activity. *Lum v. Bank of America*, 361 F.3d 217, 223 (3d Cir.2004).

26. Ms. Marshall should recall that under RICO, the alleged racketeering activity itself cannot constitute the entire enterprise; this activity must be separate and distinct from the enterprise itself. *Turkette*, 452 U.S. at 583, 101 S.Ct. 2524 ("[t]hat a wholly criminal enterprise comes within the ambit of the statute does not mean that a 'pattern of racketeering activity' is an 'enterprise' "). Although the "bare allegations" in the Second Amended Complaint are sufficient to survive a motion to dismiss this claim, the Court cautions that future successful attacks on this claim may not be avoidable unless Ms. Marshall demonstrates that each, or any, of the proposed enterprises function separately and distinctly from the conspiracy itself. For example, the Court notes that Ms. Marshall alleges that Lepanto, the only defendant which is a corporate entity, is alleged to have been formed for the purpose of furthering the scheme, thereby suggesting that Lepanto existed for no reason other than housing the fraudulently conveyed assets. *See Second Amended Complaint* at ¶ 28 (alleging that Mr. Matthei "formed and began to utilize Lepanto as a part of the Scheme, to hold a substantial portion of the Diverted assets or their proceeds"). Thus, although the "bare allegation" that the Defendants constitute one or more separate enterprises necessitates allowing the claim to proceed at this point, the

Court foresees the time when Ms. Marshall will be challenged to demonstrate how these enterprises operated independently, or to consider withdrawing the RICO claims.

27. The Court notes that in *Dianese v. Comm. of Pa.*, No. 01–2520, 2002 WL 1340316 (E.D.Pa. June 19, 2002), a case cited by the Defendants, the court dismissed a RICO claim on the basis that the enterprise alleged was not separate and distinct from the alleged racketeering activity. However, *Dianese* is distinct from the present case. In *Dianese*, the plaintiffs included *in their allegation* the statement that the group of individuals alleged to comprise the enterprise were "associated in fact and not a legal entity," and were associated "for the purpose of carrying out the predicate acts." *Dianese*, 2002 WL 1340316, at \*11. In the present case, despite Ms. Marshall's implying that Lepanto was structure solely for the purpose of transferring Mr. Matthei's assets, the Second Amended Complaint separately alleges that Lepanto, along with the other Defendants, constituted independent enterprises under the RICO statute. On a motion to dismiss a complaint, a court may only consider the allegations as stated. Thus, while discovery on this allegation might ultimately disprove the existence of a separate enterprise, that analysis must be left for another day.

Racketeering activity is defined to include any act which is indictable under the federal mail fraud or wire fraud statutes. *Smith v. Berg*, 247 F.3d 532, 537 (3d Cir. 2001). To the extent that allegations of federal mail fraud and federal wire fraud are sufficient to constitute predicate acts, they must be pled with specificity. *Lum*, 361 F.3d at 223.

In the Second Amended Complaint, Ms. Marshall alleges that Mr. Fenstermacher and High Swartz were essential to the fraudulent scheme through which Mr. Matthei's assets were improperly transferred, and that the activities of all of the Defendants constituted a pattern of racketeering activity beginning "no later than December 1995" and continuing through the present. *Second Amended Complaint* at ¶¶ 155–157. In support of these allegations, Ms. Marshall alleges that the following specific racketeering activities occurred: (1) multiple instances of mail fraud in furtherance of the transactions and requested backdating of documents transferring shares of Lepanto stock, including the mailing of letters attached hereto; (2) multiple instances of wire fraud,[28] including the use of interstate and international telephone lines to communicate regarding the illegal transaction, as well as to conceal the settlement of Mr. Matthei's employment lawsuit; and (3) engaging in money laundering by knowingly engaging in "monetary transactions in

criminally derived property of a value greater than $10,000." *Second Amended Complaint* at ¶ 158. Ms. Marshall also includes, by way of exhibits to the Second Amended Complaint, several letters, some of which were mailed or received by Mr. Fenstermacher, that allegedly served the purpose of carrying out the fraudulent scheme of backdating the transfer of Mr. Matthei's assets. *Second Amended Complaint* at ¶ 159. Assuming, as the Court must, that these allegations are true, the Court finds that these allegations are sufficiently specific to support allegations of racketeering activity, and that Ms. Marshall has therefore sufficiently alleged that the Defendants engaged in a pattern of fraudulent activity, and, as such, the ninth count of the Second Amended Complaint will not be dismissed.

### b. Count X—Violation of Section 1962(d)

■■■■■ Defendants also argue that because Ms. Marshall has not pled sufficient facts to support a violation of Section 1962(c), the Defendants could not have conspired to violate RICO and, therefore, the Section 1962(d) claim alleged as the tenth count of the Second Amended Complaint must also fail. Section 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this subsection." 18 U.S.C. § 1962. Al-

---

**28.** The federal statute prohibiting mail fraud states that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter ... shall be fined under this title or imprisoned not more than 30 years, or both." 18 U.S.C. § 1341. The federal statute prohibiting wire fraud states that "[w]hoever, having devised or intending to devise any scheme or artifice

to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings ... for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. § 1343. The Court has not been made aware that either Mr. Fenstermacher or High Swartz have been charged with either mail fraud or wire fraud in relation to this case.

though allegations of a conspiracy to commit a crime that would violate Section 1962(a), (b) or (c) are sufficient to support a claim under Section 1962(d), liability under Section 1962(c) is not a prerequisite for liability under Section 1962(d). *Salinas v. United States,* 522 U.S. 52, 63, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997); *see also Smith v. Berg,* 247 F.3d 532, 537 (3d Cir. 2001) ("*Salinas* makes clear that § 1962(c) liability is not a prerequisite to § 1962(d) liability"). Thus, to determine whether this count of the Second Amended Complaint should be dismissed, the Court need only consider whether the allegations are sufficient to support a claim for conspiracy among the Defendants. *Salinas,* 522 U.S. at 63, 118 S.Ct. 469.

 To establish that a conspiracy exists, the partners in such a conspiracy must "agree to pursue the same criminal objective and may divide up the work." *Id.* However, each co-conspirator is responsible for the acts of each other, even if a particular conspirator "does not agree to commit or facilitate each and every part of the substantive offense." *Id.*

Assuming all of the allegations in the Second Amended Complaint to be true, the Court concludes that Ms. Marshall has sufficiently alleged the existence of a conspiracy between the defendants. In the Second Amended Complaint, Ms. Marshall alleges that the Defendants "conspired to violate 18 U.S.C. § 1962(c) ... by effectuating the Fenstermacher Transactions, including the fraudulent backdating of the Lepanto documents, the execution of the Consent Order and Fenstermacher's false statement to the Slough County Court, and ... acting to conceal their unlawful actions from the federal authorities, Marshall, and the Courts." *Second Amended Complaint* at ¶ 166. Ms. Marshall further alleges that the Defendants "shared a common purpose in facilitating the removal of Matthei's assets from the reach of his creditors," and that each Defendant "knowingly agreed to engage in a Scheme which includes the operation or management of the RICO enterprises." *Second Amended Complaint* at ¶ 167. These claims, if true, sufficiently allege that a conspiracy existed between the Defendants for the purpose of defrauding creditors. Moreover, to the extent that the actions taken by the conspirators is found to be in violation of the federal mail and wire fraud statutes, the conspiracy would violate Section 1962(c). Therefore, Count Ten of the Second Amended Complaint will not be dismissed.

### 9. Counts XI and XII—New Jersey RICO Statutory Offenses [29]

 In counts Eleven and Twelve of the Second Amended Complaint, Ms. Marshall alleges that the Defendants violated

---

**29.** The New Jersey racketeering statute states that "[a]ny person damaged in his business or property by reason of a violation of N.J.S. 2C:41–2 may sue therefor in any appropriate court...." N.J.S.A. § 2C:41–4(c) (West 2005). In turn, Section 41–2(c) of the New Jersey statute provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity...." Examining only the allegations of the Second Amended Complaint, the Court concludes that Ms. Marshall sufficiently alleges that Mr. Fenstermacher was either employed and/or associated with Mr. Matthei, Mr. Burgess, Ms. Dawson, through transfers of Lepanto stock or otherwise, in conspiring to ensure that Mr. Matthei's assets were transferred to avoid repayment of his debts. *Second Amended Complaint* at ¶¶ 172–83. Thus, Ms. Marshall alleges that she has been damaged by a violation of the New Jersey statute. Although, as discussed above, Pennsylvania law applies to the common law claims alleged in the Second Amended Complaint, these statutory claims shall be considered according to the New Jersey statute.

sections (c) and (d) of the New Jersey Racketeer Influenced and Corrupt Organizations Act ("New Jersey RICO"). Section 41–2(c) of New Jersey RICO provides that "[i]t shall be unlawful for any person employed by or associate with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity...." N.J.S.A. § 2C:41–2(c). In turn, Section 41–2(d) provides that "[i]t shall be unlawful for any person to conspire ... to violate any provisions of this section." N.J.S.A. § 2C:41–2(d). While the legislative purpose and goal of the New Jersey RICO statute may be distinct from those of the federal RICO statute, New Jersey courts note that the statutes are parallel, and that they therefore "heed federal legislative history and case law in construing [the New Jersey RICO] statute." *State v. Ball*, 141 N.J. 142, 661 A.2d 251, 258 (1995). Because New Jersey courts construe the New Jersey RICO statute in the same way as the federal RICO statute, the Court's analysis with respect to the federal RICO claims applies to the New Jersey RICO claims, and for the reasons discussed above, Counts Eleven and Twelve of the Second Amended Complaint will not be dismissed.

### 10. Counts XIII and XIV against High Swartz

In the thirteenth and fourteenth counts of the Second Amended Complaint, Ms. Marshall alleges that High Swartz and Hetherington bear liability for the actions of their respective employees under the doctrines of *respondeat superior* and ratification. In the present Motion to Dismiss the Second Amended Complaint, Defendants urge that because all of the claims against Mr. Fenstermacher must be dismissed, liability based upon either of these doctrines is rendered moot. While the

Court agrees that if all counts of the Second Amended Complaint were to be dismissed, Defendants' argument would prevail, because some of the counts of the Second Amended Complaint are not dismissed, these two counts must remain.

### C. Collateral Estoppel and Res Judicata

■ In addition to their substantive arguments, the Defendants also argue that Ms. Marshall's claims are barred by the doctrines of res judicata and/or collateral estoppel. The Defendants specifically assert that because in *Marshall v. Matthei*, 327 N.J.Super. 512, 744 A.2d 209 (2000) the court found that Mr. Matthei (1) had disposed of the settlement assets "by expenditure, investment and payment over to his new wife," (2) entered into a prenuptial agreement to transfer his assets to his new wife, and (3) the assets were transferred with the intent to defraud "his first wife, his children and Marshall," the allegations presented in the Second Amended Complaint have already been decided. *Motion to Dismiss* at ¶ 60. Thus, Defendants argue that Ms. Marshall "cannot now argue that Fenstermacher's conduct somehow reversed or limited that determination." *Memorandum Supporting Motion to Dismiss* at 11. The Defendants further argue that Ms. Marshall is not alleging that she is precluded from pursuing the assets from Mr. Matthei, or that "her task has been made more difficult by anything done by Fenstermacher." *Id.* at 12. Finally, the Defendants assert that because Ms. Marshall "had a full and fair opportunity to litigate her claims in the New Jersey Superior Court and the court granted her the relief that she sought," she cannot relitigate those claims in this action. *Id.* at 12.

### 1. Collateral Estoppel

■ Under the doctrine of collateral estoppel a plaintiff's claim will be barred

if: (1) the issue decided in the prior adjudication was identical with the one presented in the current action; (2) there was a final judgment with respect to that issue on the merits; (3) the party against whom collateral estoppel is asserted must have been a party or in privity with the party to the prior adjudication; and (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in question in the prior litigation. *Witkowski v. Welch*, 173 F.3d 192, 199 (3d Cir.1999).

After reviewing the facts presented and the allegations of the Second Amended Complaint, the Court concludes that collateral estoppel does not bar Ms. Marshall's claims in this Court. Although the issue of whether Mr. Matthei had personally concealed and fraudulently conveyed his assets appears to have been decided by the New Jersey court, it does not appear that that court decided whether either Mr. Fenstermacher or High Swartz conspired to assist this conduct. While the claims arise from the same core set of facts, the issue as to these Defendants' alleged actionable conduct was neither presented to nor decided by the New Jersey court. Moreover, the Defendants in this action were not parties to the New Jersey court action, nor could they likely be considered to be in privity with Mr. Matthei. For these reasons, collateral estoppel does not bar the present claims.

## 2. Res Judicata

■■■■ Under the doctrine of res judicata in Pennsylvania,[30] "a final judgment on the merits by a court of competent jurisdiction will bar any future suit between the parties or their privies in connection with the same cause of action." *Jett v. Beech Interplex, Inc.*, No. 02–9131, 2004 WL 1588230, at *2 (E.D.Pa. July 15, 2004). For res judicata to apply, the following elements must be present: (1) identity of the thing sued upon; (2) identity of the cause of action; (3) identity of the parties; and (4) identity of the capacity of the parties. *Id.* The Court of Appeals for the Third Circuit has stated that for res judicata to apply under Pennsylvania law, the party *against whom* preclusion is sought must have been a party to the prior suit. *National Railroad Passenger Corp. v. Pennsylvania Public Utility Comm'n*, 342 F.3d 242, 252 (3d Cir.2003).

■■■■ None of the papers submitted suggest that any of the Defendants seeking to dismiss the present claim were defendants in the New Jersey litigation between Ms. Marshall and Mr. Matthei. Thus, the parties in this action are not identical to those of the prior action. Although the causes of action in this case and the case decided by the New Jersey court are similar, the parties were not the same, and res judicata does not apply in this case.

## CONCLUSION

For the reasons discussed above, the Defendants' Motion to Dismiss the Second Amended Complaint is granted in part and denied in part. The Motion is granted with respect to Counts I, II, V, VI, VII and VIII, and is denied with respect to Counts IV, IX, X, XI, XII, XIII, and XIV.[31] An appropriate Order follows.

## ORDER

**AND NOW**, this 23rd day of August, 2005, upon consideration of the Motion to

---

**30.** Because the Court has concluded that Pennsylvania law applies to the state law claims, Pennsylvania law will be addressed here.

**31.** The Court notes that Count III of the Second Amended Complaint is only alleged against Emma Dawson, who is not a party to the present Motion. Thus, Count III is unaffected by the present Motion.

Dismiss the Second Amended Complaint filed by High Swartz, Roberts and Seidel, LLP and Ronald Fenstermacher, Esquire (Docket No. 15), the response thereto (Docket No. 18), all supplemental submissions thereafter (Docket Nos. 20, 23, 24, 32, 33), and after oral argument on the Motion it is **ORDERED** that the Motion is **GRANTED** in part and **DENIED** in part. The Motion is **GRANTED** as to Counts I, II, V, VI, VII, and VIII, and these counts will be dismissed as to Mr. Fenstermacher and High Swartz. The Motion is **DENIED** as to Counts IV, IX, X, XI, XII, XIII and XIV. It is **FURTHER ORDERED** that the Defendants shall file their answer to the remaining counts of the Second Amended Complaint within 20 days from the date of this Order.